## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
SLASH CREEK WATERWORKS, INC.         )
57198 Islington Court                    )
Hatteras, NC 27943                  )
)
J & C CHARTERS, LLC               )
141 Bayview Boulevard            )
Atlantic Beach, NC 28512       )
)
TILMAN GRAY d/b/a AVON SEAFOOD )
40089 Harbor Road                 )
Avon, NC 27915                   )
)
ANTONIO GIAMBANCO          )
2323 Middlecoff Court             )
Titusville, FL 32780              )
)
J. RYAN SPECKMAN              )
2001 Yorkgate Drive              )
Raleigh, NC 27612              )
)
      *Plaintiffs*                )
)
      v.                         )      Civil Action No. 23-cv-1755
)
GINA M. RAIMONDO, in her official capacity as )
Secretary of Commerce         )
U.S. Department of Commerce    )
1401 Constitution Ave NW      )
Washington, DC 20230        )
)
NATIONAL MARINE FISHERIES SERVICE )
Room 14555                  )
1315 East-West Highway       )
Silver Spring, MD 20910       )
)
      *Defendants*           )
)
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.      This case challenges the current lack of accountability for dead discards of red snapper in the South Atlantic Snapper-Grouper fishery, which violates several provisions of the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801–1891d ("Magnuson-Stevens Act" or "the Act").

2.      Defendants Gina M. Raimondo, in her official capacity as Secretary of Commerce, and the National Marine Fisheries Service recently promulgated a temporary rule establishing directed fishing seasons for red snapper in the South Atlantic for the 2023 calendar year. The temporary rule implements prior regulations from Amendment 43 to the Snapper-Grouper Fishery Management Plan.

3.      The Amendment 43 regulations, in conjunction with the temporary rule, establish and implement an annual catch limit for red snapper that is set in terms of landings only—ignoring dead discards, which represent the overwhelming majority of catch. This approach fails to limit catch of South Atlantic red snapper, fails to prevent overfishing, and creates a de facto reallocation of red snapper to the recreational sector, each of which is contrary to law.

4.      Plaintiffs Slash Creek Waterworks, Inc., J & C Charters, LLC, Tilman Gray, Antonio Giambanco, and J. Ryan Speckman are commercial fishing companies, fishermen, fish buyers, and processors who are harmed by Defendants' failure to limit dead discards of red snapper, and hereby challenge the temporary rule and the Amendment 43 regulations under the Magnuson-Stevens Act and the Administrative Procedure Act, 5 U.S.C. §§ 701–706 ("APA").

5.      Plaintiffs request this Court vacate the temporary rule and the Amendment 43 regulations, and require Defendants to establish and implement revised annual catch limits for South Atlantic red snapper that: limit dead discards as well as landings; prevent overfishing; and reflect the previously approved allocation ratio between commercial and recreational sectors.

## JURISDICTION AND VENUE

6.      The Court has jurisdiction over this case pursuant to the Magnuson-Stevens Act, which provides that the "district courts of the United States shall have exclusive jurisdiction over any case or controversy arising under" the Act. 16 U.S.C. § 1861(d). The Act allows judicial review of regulations and fishery management actions as follows:

> (1) Regulations promulgated by the Secretary under this Act and actions described in paragraph (2) shall be subject to judicial review to the extent authorized by, and in accordance with, [the APA], if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as applicable; . . .
>      . . .
> (2) The actions referred to in paragraph (1) are actions that are taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing.

*Id.* § 1855(f).

7.      Plaintiffs challenge a temporary rule published by the National Marine Fisheries Service in the Federal Register on May 25, 2023, as well as the underlying regulations upon which the temporary rule is based, which come from Amendment 43 to the Snapper-Grouper Fishery Management Plan. *See* 2023 Red Snapper Commercial and Recreational Fishing Seasons, 88 Fed. Reg. 33,838 (May 25, 2023) ("2023 Temporary Rule"); Amendment 43, 83 Fed. Reg. 35,428 (July 26, 2018) ("Amendment 43 regulations"). The 2023 Temporary Rule establishes the dates of opening and closure of the South Atlantic red snapper fisheries for the 2023 calendar year, thereby implementing the red snapper annual catch limit established under the Amendment 43 regulations. *See* 88 Fed. Reg. at 33,838; 83 Fed. Reg. at 35,429.

8.      Plaintiffs are filing this Complaint within 30 days of publication of the 2023 Temporary Rule in the Federal Register. *See* 16 U.S.C. § 1855(f)(1); Fed. R. Civ. P. 6.

9.     The Court also has jurisdiction over this case pursuant to the APA, which provides generally that final agency action is subject to judicial review. 5 U.S.C. §§ 701–706. The APA allows courts to "hold unlawful and set aside agency action . . . found to be arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law," *id.* § 706(2)(A), and to "compel agency action unlawfully withheld," *id.* § 706(1).

10.     Defendants' issuance of the Amendment 43 regulations and the 2023 Temporary Rule is an "agency action" subject to judicial review under the APA. 5 U.S.C. §§ 701, 704.

11.     The Court further has jurisdiction over this action pursuant to 28 U.S.C. § 1331, which grants the district courts "original jurisdiction of all civil actions arising under the . . . laws . . . of the United States," as well as 28 U.S.C. § 1361, which grants the district courts "original jurisdiction of any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

12.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b), (e)(1)(A)–(B), and 5 U.S.C. § 703, because Defendants reside in this judicial district, and because a substantial part of the events or omissions giving rise to the claims occurred in the District of Columbia.

## PARTIES

13.     Plaintiff Slash Creek Waterworks, Inc. ("Slash Creek") is a corporation organized under the laws of North Carolina and located in Hatteras, North Carolina. Slash Creek is a commercial fishing business that holds a limited entry South Atlantic Snapper-Grouper permit and fishes for, lands, and sells various snapper-grouper species including red snapper. The current low commercial trip limit for red snapper—which is a consequence of ongoing high levels of dead discards from the recreational sector—harms Slash Creek by restricting its ability

4

to harvest and sell available red snapper. If dead discards actually were limited under the annual catch limit, as required by the Magnuson-Stevens Act, Slash Creek reasonably anticipates that overfishing would end, the red snapper stock would be declared rebuilt sooner, and commercial trip limits would increase. Increased commercial trip limits for red snapper would provide increased revenue for Slash Creek and thereby help Slash Creek stay in business, given the myriad other financial and fishing constraints under which it operates.

14.     Plaintiff J & C Charters, LLC ("J & C") is a limited liability company organized under the laws of North Carolina and located in Atlantic Beach, North Carolina. J & C is a commercial fishing business that owns and operates two fishing vessels in the South Atlantic region with limited entry Snapper-Grouper permits. J & C was established in 2008, and since then has caught and sold red snapper among other snapper-grouper species. J & C accordingly earns a portion of its annual revenue from red snapper. The current low commercial trip limit for red snapper—which is a consequence of ongoing high levels of dead discards from the recreational sector—harms J & C by restricting its ability to harvest and sell available red snapper. If dead discards actually were limited under the annual catch limit, as required by the Magnuson-Stevens Act, J & C reasonably anticipates that overfishing would end, the red snapper stock would be declared rebuilt sooner, and commercial trip limits would increase. Increased commercial trip limits for red snapper would provide increased revenue for J & C and thereby help J & C stay in business, given the myriad other financial and fishing constraints under which it operates.

15.     Plaintiff Tilman Gray ("Gray") is an individual doing business as Avon Seafood, a sole proprietorship located in Hatteras, North Carolina. Avon Seafood is a commercial fish buyer, packing house, and wholesaler. In his capacity as owner of Avon Seafood, Gray buys and

sells South Atlantic snapper-grouper species including red snapper. Because commercial trip limits for red snapper are extremely low currently—as a result of excessive and unaccountable recreational catch—Gray has access to relatively little red snapper for purchase and sale. If dead discards actually were limited under the annual catch limit, as required by the Magnuson-Stevens Act, Gray reasonably anticipates that overfishing would end, the red snapper stock would be declared rebuilt sooner, and commercial trip limits would increase. Increased commercial trip limits for red snapper would result in more red snapper being available for Gray to purchase and sell, and thereby increase revenue for Gray and help his business stay viable, given the relatively narrow margins under which he operates.

16.     Plaintiff Antonio Giambanco ("Giambanco") is a commercial fisherman residing in Titusville, Florida. Giambanco owns a commercial fishing vessel with a limited entry Snapper-Grouper fishing permit, and commercially fishes for snapper-grouper species including red snapper in the South Atlantic region. Giambanco lands and sells red snapper, among other species, and a portion of his annual income is from red snapper. Giambanco further buys and sells commercially-caught fish, including red snapper, and earns income from that activity. The current low commercial trip limit for red snapper—which is a consequence of ongoing high levels of dead discards from the recreational sector—harms Giambanco by removing a potentially significant source of income, and forcing him to fish farther north during the summers, away from Florida, where there is less red snapper bycatch. If dead discards actually were limited under the annual catch limit, as required by the Magnuson-Stevens Act, Giambanco reasonably anticipates that overfishing would end, the red snapper stock would be declared rebuilt sooner, and commercial trip limits would increase. Increased commercial trip limits for red snapper would provide increased revenue for Giambanco and thereby help him maintain

positive net revenue, given the numerous financial and fishing constraints under which he operates. It further would allow him to fish closer to his home throughout the year, and thereby spend more time with his loved ones.

17.     Plaintiff J. Ryan Speckman ("Speckman") is a seafood buyer, processor, and wholesaler, as well as an owner of retail seafood markets, proprietor of a seafood restaurant, and manager of a Community Supported Fishery. Speckman is based in Raleigh, North Carolina, and buys his products exclusively from fishermen on the North Carolina coast. In the course of his business operations, Speckman buys, processes, sells, and serves South Atlantic red snapper when it is available. Because commercial trip limits for red snapper currently are extremely low—as a result of excessive and unaccountable recreational catch—Speckman has access to relatively little red snapper for his business operations. If dead discards actually were limited under the annual catch limit, as required by the Magnuson-Stevens Act, Speckman reasonably anticipates that overfishing would end, the red snapper stock would be declared rebuilt sooner, and commercial trip limits would increase. Increased commercial trip limits for red snapper would result in more red snapper being available for Speckman to purchase, process, and distribute. This in turn would mean increased revenue for Speckman's business operations, which would help him stay economically viable given the relatively small margins under which he operates.

18.     In addition to the impacts described above, all five Plaintiffs have been harmed directly in recent years by the excessive amount of fish killed as recreational dead discards. Plaintiffs calculate, based on the most recent stock assessment, that if recreational dead discards in recent years (i.e., from 1999-2019) had been properly accounted for and allocated under the approved ratio of 28.07 percent commercial and 71.93 percent recreational, the South Atlantic

commercial fishing sector including Plaintiffs would have had the opportunity to harvest fish

worth upwards of $29 million in present-day dollars. Such revenue would have allowed

Plaintiffs, as well as other commercial fishing operations in the South Atlantic region, to invest

in infrastructure and maintenance instead of deferring these things and ending up in an

increasingly marginal economic existence.

19.     Defendant Gina M. Raimondo ("Raimondo"), the United States Secretary of

Commerce, is the highest-ranking official within the Department of Commerce and, in that

capacity, has formal responsibility for the administration and implementation of the Magnuson-

Stevens Act, as well as for compliance with all other federal laws applicable to the Department

of Commerce. Raimondo, through her designee National Marine Fisheries Service, as described

below, took the challenged actions in this lawsuit by approving Amendment 43, promulgating

the Amendment 43 regulations, and implementing the Amendment 43 regulations through the

2023 Temporary Rule. She is sued in her official capacity.

20.     Defendant National Marine Fisheries Service ("NMFS") is a federal agency

within the Department of Commerce, with the responsibility of protecting and managing the fish,

marine mammals, and other marine resources of the United States. NMFS has been delegated

authority by the Secretary of Commerce to implement and enforce the Magnuson-Stevens Act,

including approving fishery management plans and amendments to those plans, and

promulgating implementing regulations. NMFS is the government agency primarily responsible

for ensuring that the requirements of the Magnuson-Stevens Act are followed and enforced,

including the requirement to set annual catch limits that actually limit catch and prevent

overfishing, as well as comply with allocation-related requirements. NMFS took the challenged

actions in this lawsuit by approving Amendment 43, promulgating the Amendment 43

regulations, and implementing the Amendment 43 regulations through the 2023 Temporary Rule.


## LEGAL BACKGROUND

**The Magnuson-Stevens Fishery Conservation and Management Act**

21.     Congress enacted the Magnuson-Stevens Act in 1976, in order "to conserve and

manage the fishery resources found off the coasts of the United States." 16 U.S.C. § 1801(b)(1).

22.     The Act establishes eight Regional Fishery Management Councils, including the

South Atlantic Fishery Management Council ("South Atlantic Council"), which manages

fisheries in federal waters off North Carolina, South Carolina, Georgia, and the east coast of

Florida. *Id.* § 1852(a)(1)(C).

23.     Councils are tasked with preparing fishery management plans and amendments

for each fishery within their geographic areas of authority, *id.* § 1852(h)(1), as well as

recommending regulations to implement such plans and amendments, *id.* § 1853(c).

24.     The Secretary of Commerce, acting through NMFS, reviews all submitted plans,

plan amendments, and regulations, *id.* § 1854(a)–(b), and upon approval, promulgates

regulations and otherwise implements the plans and plan amendments, *id.* §§ 1854(b)(3),

1855(d).

25.     The Act requires that all fishery management plans, plan amendments, and

implementing regulations be consistent with ten "National Standards" for fishery conservation

and management. *Id.* § 1851(a).

26.     National Standard 1 requires that "[c]onservation and management measures shall

prevent overfishing while achieving, on a continuing basis, the optimum yield from each fishery

. . . ." *Id.* § 1851(a)(1). Optimum yield in turn is defined by the Act as the amount of fish that "is prescribed on the basis of the maximum sustainable yield from the fishery, as reduced by any relevant social, economic, or ecological factor," and "in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery." *Id.* § 1802(33)(C).

27.     The Act defines the terms "overfishing" and "overfished" to mean "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." *Id.* § 1802(34). Regulatory guidelines promulgated by NMFS clarify that "overfishing" refers to the rate of removals from a fish stock (i.e., the act of fishing at an unsustainable rate), whereas "overfished" refers to when a stock's biomass or reproductive potential is below a level at which it can produce maximum sustainable yield on a continuing basis (i.e., the state of being depleted). *See* 50 C.F.R. § 600.310(e)(2)(i).

28.     National Standard 4 provides that "If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4). NMFS has interpreted National Standard 4, through regulatory guidelines, as requiring an analysis of how each allocative action relates to fishery management objectives, and how it satisfies the statutory criteria of being fair and equitable, and reasonably calculated to promote conservation. *See* 50 C.F.R. § 600.325(c)(2). Allocations of rebuilding stocks furthermore must distribute the benefits and burdens of rebuilding evenly among participants in the fishery. *See id.* § 600.325(c)(3)(ii); *see also* 16 U.S.C. § 1854(e)(4)(B) (same).

29.     Other National Standards address science, coordination, efficiency, contingency planning, costs, fishing communities, bycatch, and safety of human life at sea. *Id.* § 1851(a)(2)–(3), (5)–(10).

30.     In addition to the National Standards, the Magnuson-Stevens Act provides direct requirements for fishery management plans. These include a requirement to "specify objective and measurable criteria for identifying when the fishery to which the plan applies is overfished (with an analysis of how the criteria were determined and the relationship of the criteria to the reproductive potential of stocks of fish in that fishery), and, in the case of a fishery which the Council or the Secretary has determined is approaching an overfished condition or is overfished, contain conservation and management measures to prevent overfishing or end overfishing and rebuild the fishery." *Id.* § 1853(a)(10).

**The Magnuson-Stevens Reauthorization Act of 2006**

31.     At the turn of the 21st Century, nearly thirty years into federal management, overfishing was still a problem in many fisheries. Even after Congress strengthened the Magnuson-Stevens Act's sustainability requirements in 1996—adding measures like mandatory rebuilding plans and habitat protection—NMFS and the Councils continued to struggle with ending overfishing.

32.     Congress responded in 2006, amending the Act to add a new requirement that fundamentally changed federal fisheries management: annual catch limits. All fishery management plans going forward must "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." Pub. L. No. 109–479, § 104(a)(10), 120 Stat. 3575, 3584 (Jan. 12, 2007), *codified at* 16 U.S.C. § 1853(a)(15).

33.     Annual catch limits are numerical limits on the allowable catch for each fish stock, set every year at a level below the overfishing threshold. The idea is to set a science-based limit on allowable catch ahead of time, and stay accountable to that limit. This represented a radical change for many fisheries, which for decades had been managed with no meaningful accountability.

34.     Congress made its intent clear in 2006 that annual catch limits should be treated as actual limits—meaning caps that are not to be exceeded. *See, e.g.*, 151 Cong. Rec. S12840, S12850 (daily ed. Nov. 15, 2005) (statement of Sen. Ted Stevens) ("[T]his bill mandates the use of annual catch limits which shall not be exceeded."); S. Rep. No. 109–229, at 7 (2006) (describing annual catch limit requirement as "scientifically established annual catch limits be[ing] set and adhered to in each managed fishery"); *id.* at 21 ("The Committee expects that if a sector is likely to exceed its annual catch limit, the Council will restrict that sector's harvest to ensure the sector stays within its annual catch limit."); *accord* Magnuson-Stevens Act Provisions; Annual Catch Limits; National Standard Guidelines, 74 Fed. Reg. 3178, 3183 (Jan. 16, 2009) ("NMFS decided, that since Congress called for annual catch limits to be set, that the ACL should be considered a true limit—a level not to be exceeded.").

35.     The annual catch limit requirement, and the accountability it created, was intended to finally operationalize the Act's long-standing mandate to prevent overfishing. This was stated directly in the text of the Act, which requires annual catch limits to be set "at a level such that overfishing does not occur, 16 U.S.C. § 1853(a)(15), and is underscored by the legislative history, *see, e.g.*, S. Rep. No. 109–229, at 6-7 (2006) (pointing out that "overfishing is still occurring in a number of fisheries, even those fisheries under a rebuilding plan," and stating "[t]he Committee intends that these annual catch limits, taken with the existing overfishing and

rebuilding authorities, will ensure full compliance with the Magnuson-Stevens Act"). *Accord* 50

C.F.R. § 600.310(f)(4)(i) (NMFS reiterating in regulatory guidelines that annual catch limits

"must prevent overfishing" when measured against a stock's status determination criteria).

36.     Congress furthermore did not exempt any fisheries or sectors from the annual

catch limit mandate. "Catch," as used in the annual catch limit requirement, means all fish killed

by fishing activity, whether the fishing is recreational or commercial in nature, and whether the

fish are retained or discarded. *See, e.g.*, S. Rep. No. 109–229, at 23–24 (2006) ("Catch of all

species, whether targeted or taken as bycatch, whether retained or discarded, count toward the

annual catch limits, and fisheries are closed when these limits are reached."); *accord* 50 C.F.R.

§ 600.310(f)(1)(i) (NMFS regulatory guidelines defining catch as "the total quantity of fish,

measured in weight or numbers of fish, taken in commercial, recreational, subsistence, tribal, and

other fisheries," and specifying that "[c]atch includes fish that are retained for any purpose, as

well as mortality of fish that are discarded.").

37.     After 2006, overfishing rates across U.S. fisheries dropped significantly under the

new annual catch limits mandate. As one court subsequently observed, the new legal mandate

"fundamentally altered American fishing regulation by requiring [managers] to set hard, science-

based caps on how many fish could be caught each year and by demanding that accountability

measures be triggered when fishermen exceeded those caps." *Conservation Law Found. v.

Pritzker*, 37 F. Supp. 3d 254, 266 (D.D.C. 2014) (citations omitted).

**The Modernizing Recreational Fisheries Management Act of 2018**

38.     Recreational saltwater fishing has been growing steadily in popularity in the

United States. In 2020, recreational anglers took nearly 200 million fishing trips nationwide. *See*

NOAA Fisheries, 2020 Fisheries of the United States, at 12 (2022). In many fisheries,

particularly in the South Atlantic, Mid-Atlantic, and Gulf of Mexico regions, recreational catch now equals or exceeds commercial catch.

39.     In recognition of the rapid expansion of recreational fishing, Congress passed the Modernizing Recreational Fisheries Management Act of 2018, Pub. L. No. 115–405, 132 Stat. 5355. This legislation amended the Magnuson-Stevens Act to clarify that that recreational fisheries are indeed subject to annual catch limits—in response to arguments from recreational fishing lobbyists that they should be exempt from catch limits. In the 2018 legislation, Congress noted management options that exist for recreational fisheries, including the use of extraction rates or fishing mortality targets, but specifically stated that such options are to be used "in addition to" annual catch limits. Pub. L. No. 115–405, § 102(a)(3), 132 Stat. 5355, 5357 (codified at 16 U.S.C. § 1852(h)(8)). Congress further clarified in a rule of construction that "[n]othing in [the 2018 legislation] shall be construed as modifying the requirements of" the annual catch limit requirement, and noted the "equal application of such requirement[]" to all fishery sectors. *Id.* § 301, 132 Stat. at 5360–61 (codified as amended at 16 U.S.C. § 1801 note).

**The Administrative Procedure Act**

40.     The APA sets forth basic requirements for federal rulemaking processes, including public notice and opportunity to comment on a proposed rule and required timelines for making a final rule effective. *See* 5 U.S.C. § 553. The APA also grants the right of judicial review to "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action." *Id.* § 702.

41.     In judicial review under the APA, a court must "hold unlawful and set aside agency action . . . found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Courts also must set aside any agency action that is taken

"in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.*
§ 706(2)(C). The APA further states that courts shall "compel agency action unlawfully withheld
or unreasonably delayed." *Id.* § 706(1).

42.   An agency action is arbitrary and capricious under the APA "if the agency has
relied on factors which Congress has not intended it to consider, entirely failed to consider an
important aspect of the problem, offered an explanation for its decision that runs counter to the
evidence before the agency, or is so implausible that it could not be ascribed to a difference in
view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n v. State Farm Mutual Auto.
Ins. Co.*, 463 U.S. 29, 43 (1983).


## FACTUAL BACKGROUND

### Red Snapper and the Development of the Snapper-Grouper Fishery

43.   Red snapper (*Lutjanus campechanus*) is a highly valued marine fish whose
primary distribution in U.S. waters extends from the Gulf of Mexico to Cape Hatteras, North
Carolina. Red snapper live on the continental shelf, with juveniles inhabiting shallow nearshore
waters and adults occupying deeper waters generally in the 60-300 foot depth range. Adults tend
to live in areas with structured bottom habitat such as rocky reefs, though they also may be found
over sandy or muddy bottom areas at times. Red snapper can live for over fifty years, and grow
to a size of 40 inches and 50 pounds. Females reach reproductive maturity between 1 and 3 years
of age, but reproductive output increases with age such that older adults are significantly more
productive than younger ones.

44.   People have fished for snappers and groupers for centuries, in the area now
known as the U.S. Southeast. The first commercial landings recorded were in 1880; through the

remainder of the 1800s and the first few decades of the 1900s, commercial landings stayed at relatively modest levels. By the 1950s, however, vessel power and navigational systems had improved, and commercial fishing capacity for snappers and groupers increased substantially. *See generally* South Atlantic Fishery Management Council, Fishery Management Plan, Regulatory Impact Review, and Final Environmental Impact Statement for the Snapper-Grouper Fishery of the South Atlantic Region, at 29-32 (Mar. 1983) ("Snapper-Grouper FMP").

45.     From 1950 through 1980, South Atlantic red snapper commercial landings were in the range of 300,000-500,000 pounds per year. The recreational fishery for snappers and groupers ramped up during this same time period, as the tourism economy in the Southeast took off, and by the 1970s and 1980s recreational anglers were catching as much or more red snapper as the commercial sector. *See* Southeast Data, Assessment, and Review, SEDAR 73: South Atlantic Red Snapper Stock Assessment Report, Section II at 47 (2021) ("SEDAR 73") (Table 3).

**The Snapper-Grouper FMP and Early Amendments**

46.     Federal management of red snapper began in 1983, when the South Atlantic Council adopted the original Snapper-Grouper Fishery Management Plan (FMP). Under the FMP, red snapper are managed along with fifty-odd other species of snappers, groupers, basses, porgies, grunts, tilefishes, triggerfishes, wrasses, and jacks that inhabit federal waters in the South Atlantic region. *See generally* Snapper-Grouper FMP, at 1-7.

47.     By the time the Snapper-Grouper FMP was adopted, red snapper was already understood to be subject to overfishing (i.e., the rate of fishing was unsustainably high). *See id.* at vii-viii. The FMP provided a minimum size limit for red snapper of 12 inches, in an attempt to reduce mortality rates for the stock. *Id.* at viii.

48. High red snapper landings continued through the 1980s, however, and the stock declined to a low abundance by 1990. *See* SEDAR 73, Section II at 100 (Figure 14). NMFS and the South Atlantic Council introduced a handful of further management measures for red snapper in 1991, including an increased size limit, bag limits, and certain gear prohibitions, and established a rebuilding time period of 15 years, intended to restore the stock to healthy levels by 2006. *See* South Atlantic Fishery Management Council, Final Amendment Number 4, Regulatory Impact Review, Initial Regulatory Flexibility Analysis and Environmental Assessment (Apr. 1991).

49. Population analyses during the 1990s confirmed that red snapper continued to be subject to overfishing. *See* SEDAR 73, Section I at 29. South Atlantic red snapper accordingly was listed as "overfished" in NMFS's first Status of Stocks Report. *See* National Marine Fisheries Service, Status of Fisheries of the United States: Report to Congress (Sept. 1997).

50. New management measures were introduced in the late 1990s, including an aggregate bag limit, limited entry commercial permits, and a commercial capacity reduction program—which required (and still requires today) a 2-for-1 exchange of permits any time a permit transfer is made. *See* South Atlantic Fishery Management Council, Final Amendment 8 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (July 1997).

**Amendment 17A:  Prohibition on Red Snapper Landings**

51. In 2008, after the stock's rebuilding deadline had come and gone, NMFS conducted a new stock assessment of South Atlantic red snapper and found once again that the stock was subject to overfishing (i.e., fish were being removed from the population too rapidly) and the stock was overfished (i.e., the population size was too small). *See* Southeast Data,

Assessment, and Review, SEDAR 15 Stock Assessment Report 1 (SAR 1): South Atlantic Red Snapper, Section I at 12 (Mar. 2009). The new assessment noted that "[t]he bulk of landings of red snapper come from the recreational fishery, which have exceeded the landings of the commercial fishery by 2-3 fold over the assessment period," and also that the existing 12-inch size limit was "believed to have caused an increase in discarding." *Id.*

52.     NMFS and the South Atlantic Council responded to the new stock assessment in 2010, via Amendment 17A to the Snapper-Grouper FMP. Amendment 17A established a prohibition on possessing or landing red snapper in the South Atlantic region, provided certain gear requirements for hook and line fishing, and set an area closure for all snapper-grouper fishing that was intended to reduce dead discards of red snapper. Amendment 17A also provided a new rebuilding timeframe for red snapper of 35 years, which meant the stock would be rebuilt by the year 2044. *See* South Atlantic Fishery Management Council, Amendment 17A to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at S-1 to S-20 (July 2010); *see also* 75 Fed. Reg. 49,447 (Aug. 13, 2010) (proposed rule); 75 Fed. Reg. 76,874 (Dec. 9, 2010) (final rule).

53.     Because the new statutory requirement for annual catch limits was now in effect, Amendment 17A also defined annual catch limits for red snapper for the first time. Amendment 17A stated that red snapper catch limits would be set in terms of landings only—meaning dead discards would be excluded from the number. With this logic, Amendment 17A stated the annual catch limit for red snapper was zero because landings were being prohibited. *See* Amendment 17A at S-7, S-10.

54.     Shortly after Amendment 17A was finalized at the Council level, a new stock assessment for red snapper was released. The new assessment again found red snapper to be

subject to overfishing (i.e., the fishing mortality rate was too high), and overfished (i.e., the remaining population was too small). *See* Southeast Data, Assessment, and Review, SEDAR 24 Stock Assessment Report: South Atlantic Red Snapper, Section I at 8 (Oct. 2010). The assessment noted that "[r]ecreational fleets dominate the total [fishing mortality]" for red snapper, *id.* at 11, and found that dead discards had comprised a significant portion of total red snapper catch in recent years, *id.* at 15.

55.     Despite the 2010 stock assessment finding red snapper once again overfished and subject to overfishing, NMFS and the Council decided to postpone and subsequently remove the area closure provided in Amendment 17A, such that it never actually took effect. *See* National Marine Fisheries Service, Emergency Rule To Delay Effectiveness of the Snapper-Grouper Area Closure, 75 Fed. Reg. 76,890 (Dec. 9, 2010); National Marine Fisheries Service, Red Snapper Management Measures, 76 Fed. Reg. 23,728 (Apr. 28, 2011). The agency reasoned that "the rate of overfishing found in SEDAR 24 [the newer stock assessment] is less than the rate of overfishing found in the previous SEDAR 15 stock assessment," so the area closure no longer was necessary. *Id.* at 23,729.

**Amendment 28:  Revising Annual Catch Limits to Allow Landings**

56.     In 2012, the Council and NMFS revised red snapper management to allow directed fishing again. Under the new approach, formalized in Amendment 28, red snapper landings could be allowed if the total catch (landings plus dead discards) in the prior year did not exceed the acceptable biological catch (a number set using rebuilding projections in the most recent stock assessment) for the prior year. If landings were to be allowed, the specific amount would be calculated using a formula based on total catch numbers from the prior two years and acceptable biological catch numbers from the prior two years and the upcoming year. *See*

National Marine Fisheries Service, Temporary Rule To Establish Management Measures for the Limited Harvest and Possession of South Atlantic Red Snapper in 2012, 77 Fed. Reg. 51,939 (Aug. 28, 2012); Amendment 28 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (Jan. 2013); 78 Fed. Reg. 25,047 (Apr. 29, 2013) (proposed rule); 78 Fed. Reg. 44,461 (July 24, 2013) (final rule).

57.     Under Amendment 28 and in the preceding year, NMFS used several different data streams to estimate dead discards of red snapper, and thereby calculate total catch. Data included commercial discard logbooks, the federal recreational fisheries survey, and a separate survey covering headboats in the Southeast region. *See, e.g.*, 78 Fed. Reg. at 44,463–64 (Amendment 28 final rule describing data sources used to estimate recreational catch); 77 Fed. Reg. at 51,940 (2012 temporary rule noting data sources used to estimate discard mortality, and comparing that mortality against the acceptable biological catch).

58.     Also in 2012, NMFS and the South Atlantic Council established a formal allocation for red snapper, setting a ratio of 28.07 percent commercial to 71.93 percent recreational, which would be applied to annual catch limits going forward. *See* South Atlantic Fishery Management Council, Amendment 25 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region, at 53 (Oct. 2011); 76 Fed. Reg. 74,757, 74,760 (Dec. 1, 2011) (proposed rule); 77 Fed. Reg. 15,916, 15,924 (Mar. 16, 2012) (final rule).

59.     Using the Amendment 28 approach for setting annual catch limits, and the new allocation ratio to divide the catch limit between sectors, NMFS allowed directed catch and landing of red snapper in 2012, 2013, and 2014. *See id.* at 51,939 (2012 season); 78 Fed. Reg. at 44,461 (2013 season contained in Amendment 28 package); 79 Fed. Reg. at 32,496 (2014 season).

60.     In 2015, however, landing and possessing red snapper was prohibited. Under the

terms of Amendment 28, directed fishing for red snapper was not allowed in 2015 because in the

preceding year, total catch (landings plus dead discards) had exceeded the acceptable biological

catch. *See* 82 Fed. Reg. 50,839, 50,839. This occurred again in 2016, which was remarkable

because no open season had been allowed the prior year; it meant that the steadily increasing

level of dead discards had exceeded the acceptable biological catch on its own, with no

appreciable contribution from landed catch. *See id.* And again in 2017, the same result

occurred—until NMFS and the Council changed the rules.

**Amendment 43: Revising Annual Catch Limits to Ignore Dead Discards**

61.     In 2017, NMFS issued a temporary rule to allow directed fishing and landing of

red snapper, with designated seasons for commercial and recreational fisheries. *Id.* A new stock

assessment recently had been released, and NMFS acknowledged the assessment had again

found red snapper to be subject to overfishing (i.e., the rate of removals was too high) as well as

overfished (i.e., the population remaining was too small). *Id.* at 50,839–40. NMFS further

acknowledged that the stock assessment showed "the majority of the estimated fishing mortality

[for red snapper] occurred from estimated dead discards." *Id.* at 50,840; *see also* Southeast Data,

Assessment, and Review, SEDAR 41 Stock Assessment Report – Revision 1: South Atlantic Red

Snapper, Section VII (Apr. 2017). NMFS determined the stock assessment represented the best

available science, and published a public notice confirming that South Atlantic red snapper had

yet again been found to be subject to overfishing and overfished. *See* 82 Fed. Reg. 18,434 (Apr.

19, 2017).

62.     Because the new stock assessment showed a modest uptick in red snapper

biomass in recent years, however, NMFS declared that "sufficient steps had been taken to

address overfishing." 82 Fed. Reg. at 50,840. The agency furthermore "determined that allowing limited harvest of red snapper in 2017 is not likely to result in overfishing." *Id.* NMFS decided to allow landing of red snapper in 2017 at the same levels that occurred in the 2014 seasons— reasoning that perhaps the stock could sustain that level of mortality, as index data appeared to show continued upward trends after 2014. *Id.* at 50,840–41.

63.      Immediately following the temporary rule, the Council recommended and NMFS approved Amendment 43, which removed the previous system for setting annual catch limits (established under Amendment 28) and replaced it with a flat recurring annual catch limit. *See* South Atlantic Fishery Management Council, Amendment 43 to the Fishery Management Plan for the Snapper Grouper Fishery of the South Atlantic Region (Nov. 20, 2017); 83 Fed. Reg. 22,938 (May 17, 2018) (proposed rule); 83 Fed. Reg. 35,428 (July 26, 2018) (final rule).

64.      The new annual catch limit in the Amendment 43 regulations was set in terms of landings only, and as with the 2017 temporary rule, it was set at the level representing the amount of landings that occurred in 2014. *See id.* at 35,429.

65.      NMFS acknowledged during the Amendment 43 process that there was a large amount of ongoing discard mortality for red snapper. *See, e.g.*, 82 Fed. Reg. 1720, 1720 (Jan. 6, 2017) (notice of intent to prepare EIS for Amendment 43) ("Discard mortality, particularly from the recreational sector, continues to be a significant source of overall mortality for red snapper."); 83 Fed. Reg. at 22,939 ("[M]ost of the catch is now discarded . . . ."); 83 Fed. Reg. at 35,428 ("[A] large majority of the estimated fishing mortality was attributed to very large and uncertain dead discard estimates . . . ."); Amendment 43, at D-1 ("Since 2010, estimates of dead discards have accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species.").

66.     NMFS nevertheless removed the only portion of the annual catch limit mechanism, established in Amendment 28, that had accounted for dead discards of red snapper. Under Amendment 28, while dead discards were not limited, they were at least minimally taken into account because if total catch (dead discards plus landings) exceeded the acceptable biological catch, the annual catch limit for landings would be set at zero in the following year. Amendment 43 removed this provision, leaving dead discards entirely out of the annual catch limit mechanism for red snapper. *See* 83 Fed. Reg. at 22,940 (stating Amendment 43 would "chang[e] the process for determining the [annual catch limit] for red snapper established in Amendment 28," and that the new process simply would set a recurring annual catch limit of 42,510 fish); 83 Fed. Reg. at 35,435 (eliminating regulatory language at 50 C.F.R. § 622.193(y) that required a comparison of total catch (landings plus dead discards) to the acceptable biological catch, and replacing that language with a recurring annual catch limit).

67.     NMFS and the Council originally described Amendment 43 as a package that would set a new annual catch limit and also contain separate management measures to deal with dead discards. *See* 82 Fed. Reg. at 1720 (notice of intent to prepare EIS) ("[T]he Council is considering methods to reduce discard mortality in Amendment 43 including spatial and temporal closures (where harvest of all snapper-grouper species would be prohibited), changes to allowable fishing gear types (e.g., circle hooks), and requiring the use of descending devices and/or venting tools for released fish.").

68.     NMFS and the Council dropped such measures from the scope of Amendment 43, however, deferring them to some undefined point in the future. *See* 82 Fed. Reg. 37,441 (Aug. 10, 2017) (revised notice of intent to prepare EA) ("[T]he Council decided to reduce the scope of actions considered in Amendment 43. The amendment now would only modify the process

implemented through Amendment 28 by revising the process to determine the commercial and recreational [annual catch limits] for red snapper. The Council may consider the other actions specified in the NOI in a future amendment.").

69.     In the course of removing dead discards entirely from the annual catch limits mechanism, NMFS maintained that "allocations [we]re outside the scope" of Amendment 43, *see* 83 Fed. Reg. at 35,423, despite the vast majority of dead discards coming from the recreational sector, at the expense of the commercial sector.

**Recent Years:  Implementing Amendment 43**

70.     Amendment 43 was implemented by NMFS in 2019, 2020, and 2021, through temporary rules published in the Federal Register, which set season opening dates for both sectors and closure dates for the recreational sector. In these implementing actions, NMFS applied the annual catch limit established in the Amendment 43 regulations, used the existing allocation ratio to divide it between commercial and recreational sectors, and calculated the recreational season length based on updated catch rate estimates for each year. *See* National Marine Fisheries Service, 2019 Red Snapper Commercial and Recreational Fishing Seasons, 84 Fed. Reg. 7827 (Mar. 5, 2019) (noting that Amendment 43 had set a new annual catch limit for red snapper, and applying that limit to set seasons for 2019); National Marine Fisheries Service, 2020 Red Snapper Commercial and Recreational Fishing Seasons, 85 Fed. Reg. 36,165 (June 15, 2020) (same for 2020); National Marine Fisheries Service, 2021 Red Snapper Commercial and Recreational Fishing Seasons, 86 Fed. Reg. 30,393 (June 8, 2021) (same for 2021, except omitting mention of Amendment 43).

71.     In 2021, the most recent stock assessment was completed for South Atlantic red snapper.  Scientists once again found red snapper to be subject to overfishing (i.e., fish were

being killed to rapidly) and overfished (i.e., the spawning stock biomass was too low). *See* Southeast Data, Assessment, and Review, SEDAR 73, South Atlantic Red Snapper: Stock Assessment Report, Section II at 10 (Mar. 2021); *see also* National Marine Fisheries Service, Determination of Overfishing or an Overfished Condition, 86 Fed. Reg. 41,022, 41,023 (July 30, 2021) (noting that South Atlantic red snapper was yet again found to be "both subject to overfishing and overfished").

72.     The new stock assessment again found that overfishing was being driven by recreational dead discards. *See* SEDAR 73, Section II at 10 (noting progress toward rebuilding spawning stock biomass, but that "the primary driver of overfishing is recreational discards"); *id.* at 113 (Figure 27 showing relative contributions to fishing mortality on red snapper); *id.* at 64, 66 (Tables 20 and 22 reflecting that in the terminal years of the assessment (2017–2019), an average of 85% of catch by weight came from dead discards).

73.     NMFS issued further temporary rules in 2022 and 2023, implementing the Amendment 43 regulations and setting seasons for directed red snapper fishing. *See* National Marine Fisheries Service, 2022 Red Snapper Commercial and Recreational Fishing Seasons, 87 Fed. Reg. 31,190 (May 23, 2022); National Marine Fisheries Service, 2023 Red Snapper Commercial and Recreational Fishing Seasons, 88 Fed. Reg. 33,838 (May 25, 2023).

74.     The subject of this challenge is the last of these implementation actions—the 2023 Temporary Rule—as well as the underlying regulations from Amendment 43.

//

//

//

//

**FIRST CLAIM FOR RELIEF:**
**DEFENDANTS HAVE FAILED TO ESTABLISH A LIMIT ON THE ANNUAL CATCH**
**OF SOUTH ATLANTIC RED SNAPPER AS REQUIRED BY 16 U.S.C § 1853(a)(15)**

75.     Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

76.     The Magnuson-Stevens Act requires NMFS to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

77.     Congress intended the word "catch" in 16 U.S.C. § 1853(a)(15) to include both landings and dead discards.

78.     Congress intended the word "limit" in 16 U.S.C. § 1853(a)(15) to have its ordinary meaning as a value not to be exceeded.

79.     The annual catch limit for South Atlantic red snapper was set in regulations accompanying Amendment 43 to the Snapper-Grouper Fishery Management Plan.

80.     The annual catch limit for South Atlantic red snapper is implemented each year by Defendants in the form of temporary rules. The 2023 Temporary Rule was published in the Federal Register on May 25, 2023.

81.     This complaint was filed within 30 days of publication of the 2023 temporary rule, and pursuant to 16 U.S.C. § 1855(f), the 2023 Temporary Rule as well as the underlying Amendment 43 regulations are properly subject to judicial review.

82.     The annual catch limit for South Atlantic red snapper only provides a "limit" for landings, which comprise a small proportion of total catch. It provides no "limit" for dead discards, which comprise a substantial majority of total catch.

83.     The annual catch limit for South Atlantic red snapper accordingly violates the Magnuson-Stevens Act.

84.     Because recreational dead discards of red snapper are not limited, they have reached extremely high levels. Ongoing high recreational dead discards, in turn, have resulted in a present-day spawning stock biomass for South Atlantic red snapper that is smaller than otherwise would be the case, and have substantially delayed the stock's rebuilding.

85.     Commercial fishermen, buyers, and processors including Plaintiffs have struggled under the current low commercial trip limits for red snapper, which are a result of ongoing high recreational dead discards and the stock's rebuilding status. If recreational dead discards actually were limited, Plaintiffs reasonably expect that commercial trip limits would go up—particularly once red snapper is declared rebuilt—and their respective revenues will increase. This will help them and other commercial fishermen, buyers, and processors stay economically viable, given the narrow margins within which they operate.

86.     The unaccountable recreational discard mortality furthermore has deprived Plaintiffs and other commercial fishermen of potential red snapper catch and revenue in recent years—on the order of $29 million, as noted in Paragraph 18 above—causing them to defer investments in infrastructure and maintenance, and otherwise diminishing their ability to prosecute their business operations.

87.     For these reasons, Defendants have violated the Magnuson-Stevens Act and the APA, and the legal violations have harmed and will continue to harm Plaintiffs until they are remedied by this Court.

//

//

## SECOND CLAIM FOR RELIEF:
## DEFENDANTS HAVE FAILED TO ESTABLISH A MECHANISM FOR SPECIFYING ANNUAL CATCH LIMITS FOR SOUTH ATLANTIC RED SNAPPER THAT PREVENTS OVERFISHING AS REQUIRED BY 16 U.S.C § 1853(a)(15)

88.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

89.    The Magnuson-Stevens Act requires NMFS to "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery, including measures to ensure accountability." 16 U.S.C. § 1853(a)(15).

90.    Congress added annual catch limits and accountability measures to the Magnuson-Stevens Act in 2006, in order to compel NMFS and the Councils to finally comply with the Act's long-standing requirement to prevent overfishing.

91.    The current annual catch limit for South Atlantic red snapper was established in the Amendment 43 regulations, and is implemented each year by Defendants via temporary rules. The 2023 temporary rule was published in the Federal Register on May 25, 2023.

92.    This complaint was filed within 30 days of publication of the 2023 temporary rule, and pursuant to 16 U.S.C. § 1855(f), the 2023 Temporary Rule as well as the underlying Amendment 43 regulations are properly subject to judicial review.

93.    Despite Defendants purporting to manage South Atlantic red snapper under an annual catch limit since 2010, the stock continues to be subject to overfishing. The most recent stock assessment found overfishing has occurred every year in recent history, through 2019, which is the terminal year of the assessment. There is no determination or even suggestion from Defendants that overfishing has stopped in the years subsequent to 2019.

94.    Stock assessments show that dead discards alone (irrespective of landings) have been sufficiently high to cause overfishing of South Atlantic red snapper in recent years.

95.     Dead discards are excluded from Defendants' annual catch limit for red snapper, as described above.

96.     Because Defendants exclude dead discards from the annual catch limit for South Atlantic red snapper, and dead discards singlehandedly are capable of causing (and in fact have been shown to cause) overfishing on the stock, Defendants have failed to establish an annual catch limit "at a level such that overfishing does not occur." 16 U.S.C. § 1853(a)(15).

97.     Due to Defendants' failure to establish an annual catch limit that prevents overfishing, the spawning stock biomass of South Atlantic red snapper currently is lower than it otherwise would be, and the stock's achievement of rebuilt status has been delayed substantially.

98.     Commercial fishermen, buyers, and processors including Plaintiffs have struggled under the current low commercial trip limits for red snapper, which are a result of the stock's rebuilding status and the ongoing overfishing that is driven by recreational dead discards. If the annual catch limit actually prevented overfishing, Plaintiffs reasonably expect that commercial trip limits would go up—particularly once red snapper is declared rebuilt—and their respective revenues will increase. This will help them and other commercial fishermen, buyers, and processors stay economically viable, given the narrow margins within which they operate.

99.     The overfishing allowed by Defendants' annual catch limit furthermore has deprived Plaintiffs and other commercial fishermen of potential red snapper catch and revenue— around $29 million, as noted in Paragraph 18 above—causing deferred investments in infrastructure and maintenance, and diminishing their ability to run their businesses.

100.    For these reasons, Defendants have violated the Magnuson-Stevens Act and the APA, and the legal violations have harmed and will continue to harm Plaintiffs until they are remedied by this Court.

### THIRD CLAIM FOR RELIEF:
### DEFENDANTS HAVE CONDUCTED A DE FACTO REALLOCATION IN VIOLATION OF 16 U.S.C. § 1851(a)(4) AND 16 U.S.C. § 1853(a)(14) BY FAILING TO LIMIT RECREATIONAL DISCARDS OF SOUTH ATLANTIC RED SNAPPER

101.    Plaintiffs re-allege and incorporate by reference the allegations contained in all preceding paragraphs of this Complaint.

102.    National Standard 4 of the Magnuson-Stevens Act requires that "[i]f it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; [and] (B) reasonably calculated to promote conservation . . . ." 16 U.S.C. § 1851(a)(4).

103.    The Magnuson-Stevens Act further requires fishery management plans to, for all rebuilding stocks, "allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery." 16 U.S.C. § 1853(a)(14); *see also id.* § 1854(e)(4)(B) (same).

104.    NMFS has provided its interpretation of National Standard 4 and the associated allocation requirements in the Act in regulatory guidelines. 50 C.F.R. § 600.325. The agency's guidelines explain that fishery management plans should describe and analyze all fishery allocations, *id.* § 600.325(c)(2), as well as ensure allocations comply with the substantive requirements provided in National Standard 4 and the rebuilding provisions, *id.* § 600.325(c)(3).

105.    In 2012, the South Atlantic Council adopted and NMFS approved an allocation ratio for red snapper of 28.07 percent commercial and 71.93 percent recreational. *See* Amendment 25, at 53; 77 Fed. Reg. at 15,924.

106.    Allowing unlimited and unaccountable dead discards has drastically inflated the actual share of South Atlantic red snapper taken by the recreational sector in the decade or more since the allocation ratio was adopted.

107.    The inflation of recreational catch has occurred over a time period in which commercial catch has remained relatively stable, resulting in a de facto reallocation of South Atlantic red snapper.

108.    Neither NMFS nor the South Atlantic Council has acknowledged this reallocation, much less provided the analysis or deliberative consideration required by the Magnuson-Stevens Act.

109.    The reallocation furthermore fails to comply with the substantive requirements of National Standard 4 (and the related rebuilding provisions of the Act), because it is not fair nor equitable, nor is it reasonably calculated to promote conservation.

110.    The de facto reallocation that NMFS has made under the Amendment 43 regulations and the 2023 Temporary Rule has harmed commercial fishermen and buyers, including Plaintiffs, because it has dramatically reduced their share of catch of red snapper relative to the approved allocation ratio of 28.07 percent commercial and 71.93 percent recreational.

111.    Commercial fishermen and buyers including Plaintiffs have struggled under the current low commercial trip limits for red snapper, which, as explained above, represent a continuously declining share of the total catch of South Atlantic red snapper due to unaccountable and ever-increasing recreational dead discards.

112.    Absent this de facto reallocation, commercial fishermen would be entitled to significantly more catch of red snapper, given the stock's growth in abundance and biomass in

recent years. Plaintiffs estimate the lost commercial revenues in the region as a whole at around $29 million, as noted in Paragraph 18 above. This lost revenue has led to deferred investments in infrastructure and maintenance across the whole commercial sector, including Plaintiffs, and has otherwise diminished Plaintiffs' ability to prosecute their business operations.

113.     Plaintiffs reasonably expect that if and when this illegal de facto reallocation is remedied, commercial trip limits will go up, leading to increased revenues for themselves and other commercial fishermen and buyers. These increased revenues in turn will help Plaintiffs and other commercial fishermen and buyers stay economically viable, given the narrow margins within which they operate.

114.     For these reasons, Defendants have violated the Magnuson-Stevens Act and the APA, and the legal violations have harmed and will continue to harm Plaintiffs until they are remedied by this Court.

## PRAYER FOR RELIEF

For the foregoing reasons, Plaintiffs respectfully request that this Court:

1.     Declare that Defendants violated the Magnuson-Stevens Act and the APA as described above when they approved Amendment 43 and implemented it through the Temporary Rule;

2.     Vacate and set aside the Temporary Rule and the Final Rule implementing Amendment 43;

3.     Order and enjoin Defendants to, by a date certain, establish a legally adequate annual catch limit for South Atlantic red snapper that prevents overfishing, actually functions as a limit on both discarded and landed catch, and reflects the

previously adopted allocation ratio between the commercial and recreational sectors;

3.     Maintain jurisdiction over this action until Defendants are in compliance with the Magnuson-Stevens Act and the APA, and every order of this Court;

4.     Award Plaintiffs their reasonable attorneys' fees and costs pursuant to 28 U.S.C. § 2412; and

5.     Provide Plaintiff such additional and further relief as may be appropriate.


Dated:  June 16, 2023                    Respectfully submitted,

                                         /s/ Seth Atkinson
                                         Seth L. Atkinson (Bar ID CA00190)
                                         Quillback Consulting
                                         348 Nobel Drive
                                         Santa Cruz, CA 95060
                                         (203) 331-2792
                                         seth@quillbackconsulting.com

                                         *Attorney for Plaintiffs*