**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| SLASH CREEK WATERWORKS, | : | |
| INC., *et al.*, | : | |
| | : | |
| Plaintiffs, | : | Civil Action No.:    23-1755 (RC) |
| | : | |
| v. | : | Re Document Nos.:    11, 13, 32, 35 |
| | : | |
| GINA M. RAIMONDO, | : | |
| *Secretary of Commerce, et al.*, | : | |
| | : | |
| Defendants. | : | |

## MEMORANDUM OPINION

GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT; GRANTING DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT; DENYING PLAINTIFFS' MOTION FOR SUMMARY
JUDGMENT; DENYING PLAINTIFFS' MOTION FOR PARTIAL SUMMARY JUDGMENT

## I. INTRODUCTION

Plaintiffs are commercial fishermen and seafood buyers who sued Defendants alleging

that portions of Amendment 43 to the Fishery Management Plan for the Snapper-Grouper

Fishery of the South Atlantic Region violated provisions of the Magnuson-Stevens Fishery

Conservation and Management Act.  Plaintiffs contend that Defendants acted unlawfully by

failing to include so-called "dead discards" in the annual catch limit for South Atlantic red

snapper.  The parties cross-moved for summary judgment.  While those motions were pending,

Defendants promulgated a new temporary regulation.  Plaintiffs filed a supplemental complaint,

and the parties briefed cross-motions for partial summary judgment.  The Court concludes that

the case is justiciable but determines that Plaintiffs fail to show that Defendants violated the Act.

As such, the Court grants summary judgment to Defendants and denies Plaintiffs' motions for summary judgment.

## II. BACKGROUND

### A. The Magnuson-Stevens Act

In 1976, in balancing the environmental interests in preventing overfishing and the loss of marine habitat against the often competing economic interests of the United States' fishing industry, Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), Pub. L. No. 94-265, 90 Stat. 331 (1976) (codified as amended at 16 U.S.C. §§ 1801 *et seq.*). The MSA established eight regional councils, which are charged with drafting fishery management plans ("FMPs") for each fishery under their control. *See* 16 U.S.C. § 1852(a)(1), (h)(1). When a Council proposes an FMP or an amendment to an FMP, the proposal is submitted to the Secretary of Commerce, who must approve, disapprove, or partially approve the proposal. *See id.* § 1854(a)(3). The Secretary "shall consult with the Council before making any revisions to the proposed regulations, and must publish in the Federal Register an explanation of any differences between the proposed and final regulations." *Id.* § 1854(b)(3). In practice, the Secretary exercises her authority through the National Marine Fisheries Service ("NMFS"), a division of the National Oceanic and Atmospheric Administration within the Department of Commerce. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2254 (2024).

Section 1853(a) of the MSA sets forth the required components of FMPs. *See* 16 U.S.C. § 1853(a). FMPs proposed by the Councils, and any regulations promulgated to implement FMPs, must also be consistent with the MSA's ten "National Standards" for fishery conservation and management. *See id.* § 1851(a). The MSA requires the Secretary to establish advisory guidelines (the "Guidelines") to assist in the development of FMPs based on the National

Standards, but the Act provides that the Guidelines do not have the force of law. *See id.* § 1851(b). NMFS promulgated a set of Guidelines interpreting the ten National Standards and has amended the Guidelines over time to keep pace with various changes to the MSA itself. *See* 50 C.F.R. §§ 600.305–.355.

In 2007, Congress amended the MSA through the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (2007). The amendment included a new required provision for all FMPs, mandating that FMPs "establish a mechanism for specifying annual catch limits . . . at such a level that overfishing does not occur in the fishery, including measures to ensure accountability." *See id.* sec. 303(a), § 104(a)(10), 120 Stat. at 3584 (codified at 16 U.S.C. § 1853(a)(15)). The MSA defines "overfishing" as "a rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield on a continuing basis." 16 U.S.C. § 1802(34). Agency regulations find a stock to be "overfished," however, when its "biomass has declined below" the minimum stock size threshold, which is in turn defined as "the level of biomass below which the capacity of the stock or stock complex to produce [maximum sustainable yield] on a continuing basis has been jeopardized." 50 C.F.R. § 600.310(e)(2)(i)(E)–(F); *see also Lovgren v. Locke*, 701 F.3d 5, 18 n.11 (1st Cir. 2012) ("[A]s used by the NMFS, these terms are distinct."); *Guindon v. Pritzker*, 31 F. Supp. 3d 169, 179 n.3 (D.D.C. 2014) ("Because it takes time for biomass levels to recover, a stock may be designated as 'overfished' even when 'overfishing' is not currently taking place."); Defs.' Mem. in Supp. of Mot. Summ. J. at 4 n.2 ("Defs.' Mot. Summ. J."), ECF No. 13-1. Maximum sustainable yield ("MSY") is "the largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions." 50 C.F.R. § 600.310(e)(1)(i)(A). When NMFS

says that a stock is "overfished," therefore, it means that the stock is too small—not necessarily that the rate or level of fishing mortality is too high.

Before bringing the FMPs themselves into compliance with the MSA's new requirements, NMFS first updated the Guidelines to set forth the Secretary's interpretation of the new requirements in light of the National Standards.  Many of the regulations relevant to the instant dispute relate to National Standard 1 ("NS1"), which provides that "[c]onservation and management measures shall prevent overfishing while achieving, on a continuing basis, optimum yield from each fishery for the United States fishing industry."  16 U.S.C. § 1851(a)(1). Optimum yield ("OY") is defined as the amount of fish that "will provide the greatest overall benefit to the Nation, particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems."  *Id.* § 1802(33)(A).  OY is less than or equal to the MSY.  See 50 C.F.R. § 600.310(b)(2)(i).

The NS1 Guidelines set forth an overview of the components the Councils should apply in complying with the MSA's mandate.  According to the NS1 Guidelines, the overfishing limit ("OFL") for a given stock is "the annual amount of catch that corresponds to the estimate of [the Maximum Fishing Mortality Threshold ('MFMT')] applied to a stock or stock complex's abundance and is expressed in terms of numbers or weight of fish."  *Id.* § 600.310(e)(2)(i)(D).  It is set by first determining the MFMT, which is the annual rate of fishing mortality above which overfishing will occur for a particular stock, *see id.* § 600.310(e)(2)(i)(C), and then applying the MFMT to the stock's total size, *see id.* § 600.310(e)(2)(i)(D).  To serve the goal of preventing the OFL from being exceeded, the Guidelines provide for the computation of acceptable biological catch ("ABC"), which is a reduced version of the OFL that accounts for scientific uncertainty in the estimation of the OFL.  *See id.* § 600.310(f)(2)(ii).

At the center of this regime is the annual catch limit ("ACL"), which is a level of annual catch at or below the stock's ABC. *See id.* § 600.310(f)(4). The ACL is enforced by accountability measures ("AMs"), which are in-season and post-season measures to prevent the ACL from being exceeded, or to initiate corrective measures in the event that the ACL is exceeded in a given fishing year. *See id.* § 600.310(g). FMPs must contain ACLs and AMs for all managed stocks of fish in the fishery. *See id.* § 600.310(h).

National Standard 4 is also particularly relevant to this case, as it governs allocation and assignment of fishing privileges "among various United States fishermen." 16 U.S.C. § 1851(a)(4). When an FMP allocates fishing privileges among fishermen, the allocation must not discriminate among citizens of different states and must be "(A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." *Id.* NMFS defines an "allocation" or "assignment" as "a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals." 50 C.F.R. 600.325(c)(1).

## B. Red Snapper and the Snapper-Grouper FMP

NMFS implemented the Snapper-Grouper FMP in 1983, AR 006866,[1] and the plan currently manages 55 species of fish, including 10 snapper species. *See* 50 C.F.R. Part 622, Appendix A, Table 2. Management decisions concerning South Atlantic red snapper are informed by Southeast Data, Assessment and Review ("SEDAR"), a cooperative process to assess fishery stocks in the South Atlantic, Gulf of Mexico, and Caribbean. AR 006882.

---

[1] The Court refers to the administrative record, found in ECF No. 18, as "AR." The Court additionally refers to the supplemental administrative record, found in ECF No. 39, as "SAR."

Unfortunately, SEDAR assessments have demonstrated that red snapper stocks are chronically overfished. In 2008, for instance, the SEDAR 15 stock assessment showed that red snapper was overfished and subject to overfishing, AR 006883, prompting the South Atlantic Council to develop Amendment 17A to the FMP in hopes of ending overfishing and rebuilding the stock, AR 006867. That rule, which NMFS published in the Federal Register on December 9, 2010, established a 35-year rebuilding plan and prohibited the harvest of red snapper—implementing an ACL of zero—within the South Atlantic exclusive economic zone. *See* 75 Fed. Reg. 76874, 76874. On March 16, 2012, NMFS published Amendment 25, which included a rule establishing a 28.07%-71.93% ACL split between the commercial and recreational sectors, which continues to govern. *See* AR 010060; 77 Fed. Reg. 15916, 15924.

In 2013, NMFS published Amendment 28, which contained a mechanism under which at least some red snapper harvest could take place. *See* 78 Fed. Reg. 44461. Under that scheme, if the number of fish removed was less than the previous year's ABC, then fishing for red snapper would be allowed the following year. *See id.*; AR 006869. Using this process, harvest of red snapper was permitted in 2012, 2013, and 2014, but prohibited in 2015 and 2016. *See* AR 010022.

In 2016, SEDAR 41 indicated that red snapper remained overfished and subject to overfishing. *See* AR 002432; AR 002440. That report nonetheless showed an uptick in red snapper biomass "to levels not seen since the 1970's," AR 010023, and NMFS determined that permitting limited harvest of red snapper was "not likely to result in overfishing." AR 010259. NMFS thus allowed a harvest of 42,510 fish in 2017, setting a commercial ACL of 124,815

pounds of red snapper and a recreational ACL of 29,656 fish.[2] AR 010260. The agency based this ACL on the number of landings observed during the 2014 fishing season, concluding that "allowing that same amount of harvest in this temporary rule in 2017 is unlikely to result in overfishing or change the red snapper rebuilding time period." *Id*. NMFS provided for a recreational season spanning six days in November 2017, as well as a commercial season running from November 2, 2017, to December 31, 2017, or until the commercial ACL was reached. *Id*.

So-called "dead discards" represent a major cause of overfishing within the red snapper population. Fishermen generally hook red snapper at depths ranging from 141 to 234 feet, s*ee* AR 006987, and fish released at the surface often die from the effects of barotrauma, hooking, or predation, *see* AR 006852. The number of dead discards has grown in recent years due to an increase in the minimum landing size, increases in the number of young fish, fishing moratoria, and small catch limits beginning in 2012. *See* AR 009956. From 2010 to 2017, "estimates of dead discards . . . accounted for most of the total removals (92%), likely a result of incidental catch of red snapper while fishermen targeted co-occurring species." AR 006981. Estimates for "release mortality" rates range anywhere from 22 to 64 percent of fish released at the surface. *See* AR 010168; SAR 012458. For instance, an estimated 406,249 fish were killed as "dead discards" in 2016 even though NMFS set the ACL at zero. AR 006861. In addition, "the largest component of fishing mortality for Red Snapper" during this time period "came from the dead discards in the recreational fishery." AR 005053. Dead discards are a subset of "bycatch," which

---

[2] "The commercial sector's ACL is set in pounds of fish because the commercial sector reports landings in weight." AR 010023.

the MSA defines as "fish which are harvested in a fishery, but which are not sold or kept for personal use, and includes economic discards and regulatory discards." 16 U.S.C. § 1802(2).

On July 16, 2018, NMFS published Amendment 43 to the FMP, which abandoned Amendment 28's year-to-year comparison and adopted an ongoing ACL of 42,510 fish divided between the commercial and recreational sectors, again based on the number of landings observed in 2014. *See* AR 010022. In May 2016, the South Atlantic Council's Scientific and Statistical Committee ("SSC") recommended an OFL of 56,000 fish for 2018, consisting of 19,000 landed fish and 37,000 discarded fish, as well as a slightly lower ABC of 18,000 landed fish and 35,000 discarded fish. *See* AR 009956; AR 005053; *see also* 16 U.S.C. § 1852(g)(1)(A) (providing that each Council must establish "a scientific and statistical committee" to collect and evaluate scientific information for the development and amendment of FMPs). The SSC asserted at the time that these limits were based on the best scientific information available, although the committee expressed that its "assessment findings were highly uncertain regarding to what extent overfishing was occurring." AR 009956; *see also* AR 007173 (explaining that "the number of discards is dependent upon fisher recalls, and these estimates are expanded based on small sample size"). This uncertainty prompted the South Atlantic Council to request further information from the SSC and the NMFS Southeast Fisheries Science Center ("SEFSC") over the ensuing year. *Id.*

The Council asked the SEFSC, for instance, to provide red snapper projections under the assumption that all fish caught are subsequently discarded, and zero landings are permitted. AR 009957. The SEFSC responded that dead discard assessments were too uncertain to set an ABC that could be effectively monitored. *Id.* Given this uncertainty, the Council determined in March 2017 that it "did not have a useful ABC for red snapper." AR 009957. The SSC

8

concluded the following month that it was "unable to provide an ABC recommendation for Red Snapper," and that the projections from SEDAR 41—while still the best scientific information available—were not useful for management and monitoring because of uncertainty in the catch data.  AR 009957.[3]  The SEFSC and SSC planned to develop methods to conduct future red snapper stock assessments to establish an ABC that could be effectively monitored.  AR 009958.

While facing this uncertainty, the Council received information indicating that the red snapper stock was recovering.  In March 2017, the SEFSC informed the Council that the "red snapper stock was still overfished but was rebuilding . . . , and that sufficient steps had been taken to address overfishing of red snapper."  AR 009957.  A June 2017 survey program indicated "a steep upward trend in the relative abundance of red snapper."  AR 009958.  While red snapper was previously "rare" in those samples, it became "the eighth most abundant species" in the survey.  AR 009959.  An additional study presented to the Council in September 2017 demonstrated further evidence of rebuilding progress in the red snapper stock.  AR 009958.  Given this information and the lack of an operational ABC for management, the South Atlantic Council concluded that permitting harvest of the same number of fish as occurred in 2014— 42,510 fish—would not result in overfishing or prevent continued rebuilding of the stock.  *Id.*

NMFS adopted this catch limit in Amendment 43.  The agency recognized that the Council's recommendation arose in the context of "not having an ABC that was usable for management purposes."  AR 009959.  NMFS noted that 16 U.S.C. § 1852(h)(6) requires councils to develop catch limits "that may not exceed the fishing level recommendation of its SSC."  *Id.*  The National Standard 1 guidelines also prohibit the ACL from exceeding the ABC.

---

[3] The SSC did not, however, retract or change its May 2017 ABC recommendation.  AR 009957.

*Id.* (citing 50 C.F.R. § 600.310(f)(4)(i)).  NMFS nonetheless concluded that the SSC's most recent ABC recommendation comprised 53,000 fish (18,000 landed fish and 35,000 discarded fish) and that the 2014 catch limit of 42,510 fish did not exceed this ABC.[4]  *Id.*  Based on the more recent surveys, NMFS concluded that allowing this level of harvest was "based on the best scientific information available."[5]  AR 009960.  NMFS again set a six-day recreational fishing season and opened the commercial fishing season in late July.  *See* AR 010024.

In March 2021, SEDAR 73 demonstrated once again that the red snapper "stock is not yet rebuilt and is experiencing overfishing."  SAR 012002.  The report nonetheless indicated that stock had increased "rapid[ly]" since 2010.  *Id.*; *see also* SAR 012092 (showing recovery in the number of fish); *but see* SAR 012095 (showing slower recovery in terms of fish biomass and age).  Recreational dead discards remained high.  According to data from SEDAR 73 and the agency's scientific committee, private recreational fishers accounted for an average of 590,000 dead discards per year from 2018 to 2022.  *See* SAR 012458 (listing 23 percent estimated mortality rate); SAR 012455 (listing 12,819,769 total discards by private boats from 2018-2022).  This represented more than 93 percent of total dead discards over the same period, which averaged approximately 633,000 fish per year, with roughly 1.2 percent arising from the commercial sector.[6]  *See id.*; *see also* SAR 012354 ("Red snapper overfishing is being largely

---

[4] Plaintiffs do not challenge the NMFS's reasoning setting the ABC by totaling the SSC's recommendations for landings and dead discards.  *See generally* Pls.' Corrected Memorandum in Support of Mot. Summ. J., ECF No. 12-1.

[5] Plaintiffs do not contend that NMFS failed to rely on the best scientific evidence available.  *See* Pls.' Reply in Supp. Mot. Summ. J. and Opp. to Defs.' Mot. Summ. J. ("Pls.' Reply") at 25–26, ECF No. 16 (discussing the requirements of National Standard 2, codified at 16 U.S.C. § 1851(a)(2)).  Plaintiffs reaffirmed this position at the motions hearing.

[6] Plaintiffs perform these calculations in their motion for partial summary judgment based on NMFS's reported numbers, *see* Mem. in Support of Pls.' Mot. Partial Summ. J. at 30, ECF No. 32-1, and Defendants do not contest the figures.  The Court has verified these calculations.

driven by dead discards in the recreational sector, both during the directed red snapper fishing season and during the closed red snapper season while fishers are targeting snapper-grouper species that co-occur with red snapper."). NMFS "notified the [South Atlantic] Council via letter dated July 23, 2021," that "[t]he results of SEDAR 73 indicated that the South Atlantic red snapper stock remains overfished and is experiencing overfishing." SAR 012495.

On May 25, 2023, NMFS published a temporary rule establishing the 2023 red snapper fishing season, imposing the combined ACL established in Amendment 43. *See* AR 000001. This included a commercial limit of 75 pounds of fish per day and a two-day recreational fishing season with a bag limit of one fish per person per day. *See* AR 000001–02.

## C. Procedural History and Post-Complaint Events

Plaintiffs filed this lawsuit on June 16, 2023, challenging Amendment 43 and the 2023 Temporary Rule on three bases. *See* Compl., ECF No. 1. Plaintiffs first contend that by excluding dead discards from the ACL, the rules fail to establish a limit on the annual catch of red snapper as the MSA requires. *See id.* ¶¶ 75–87 (citing 16 U.S.C. § 1853(a)(15)). Second, Plaintiffs assert that this method of calculating the ACL is incapable of establishing catch limits that prevent overfishing. *See id.* ¶¶ 88–100. Third, Plaintiffs allege that by failing to limit recreational dead discards, Defendants have unlawfully conducted a de facto reallocation of fishing privileges from the commercial sector to the recreational sector. *See id.* ¶¶ 101–14. The parties then cross-moved for summary judgment, with Defendants arguing in part that Plaintiffs lack standing to challenge the rules and that Plaintiffs' claims concerning Amendment 43 are time-barred. *See generally* Pls.' Corrected Memorandum in Support of Mot. Summ. J. ("Pls.' Mot. Summ. J."), ECF No. 12-1; Defs.' Mot. Summ. J.

On June 14, 2024, NMFS published a new temporary rule governing the 2024 red snapper fishing season, which remained in effect until December 11, 2024. *See* SAR 012494. The agency explained that it was "implementing interim measures to reduce overfishing of South Atlantic red snapper in 2024 by reducing the commercial and recreational ACLs for 2024." SAR 012495. "NMFS notified the [South Atlantic] Council in July 2021 that overfishing of red snapper was occurring, but the Council ha[d] failed to take action to end overfishing as required by the Magnuson-Stevens Act." *Id.* The temporary rule reduced the ACL from 42,510 fish to 31,000 fish, which aligned with the recommendation made by the South Atlantic Council's scientific committee. SAR 012495. The length of the recreational fishing season was thus set at one day, with the commercial fishing season expected to last 35 days. *See* SAR 012496 (noting that "[t]he length of the red snapper recreational season ha[d] ranged from 2–9 days since 2017"). NMFS issued the rule under 16 U.S.C. § 1855(c)(1), which allows the Secretary to "promulgate emergency regulations or interim measures necessary to address the emergency or overfishing" if she "finds that an emergency exists or that interim measures are needed to reduce overfishing for any fishery." *See* SAR 012498.

In response to the new rule, Plaintiffs filed a Supplemented Complaint, raising the same claims against the 2024 Temporary Rule, as well. *See* Suppl. Compl., ECF No. 26-3. The parties then cross-moved for partial summary judgment related to the 2024 Temporary Rule, with Defendants arguing that claims targeting Amendment 43 and the 2023 Temporary Rule were moot. *See generally* Pls.' Mem. in Supp. of Mot. Partial Summ. J. ("Pls.' Mot. Partial Summ. J."), ECF No. 32-1; Defs.' Mem. in Supp. of Mot. Partial Summ. J. ("Defs.' Mot. Partial Summ. J."), ECF No. 35-1.

On May 15, 2024, two plaintiffs in this lawsuit filed a separate complaint against Defendants, claiming that Defendants had failed to promulgate regulations to stop overfishing and rebuild affected stocks of fish after the South Atlantic Council failed to submit proposed regulations addressing the issue. *See* Compl. ¶¶ 79–91, *Gray v. Raimondo*, No. 24-cv-1431 (May 15, 2024) (citing 16 U.S.C § 1854(e)(5)). The plaintiffs in that case alleged that NMFS had notified the South Atlantic Council of overfishing on July 23, 2021, and that the agency was therefore required to prepare regulations by July 23, 2023. *See id.* ¶¶ 80–81. On August 20, 2024, the parties entered into a stipulated settlement agreement. *See* Stipulation of Settlement, *Gray v. Raimondo*, No. 24-cv-1431 (Aug. 20, 2024). In that settlement agreement, NMFS committed to "complet[ing] and submit[ting] to the Office of the Federal Register for publication by June 6, 2025, a final rule implementing a Secretarial Amendment to stop overfishing on the South Atlantic red snapper stock under 16 U.S.C. § 1854(c) & (e)." *Id.* ¶ 1.

On January 8, 2025, the parties appeared for a motions hearing before the Court pursuant to 16 U.S.C. § 1855(f)(4). *See* Min. Entry dated Jan. 8, 2025.

### III.  LEGAL STANDARDS

In a typical case, a court may grant summary judgment to a movant who "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). But when assessing administrative action, at the summary judgment stage "the district judge sits as an appellate tribunal," *Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001), limited to determining whether, as a matter of law, the evidence in the administrative record supports the agency's decision, *Citizens for Resp. & Ethics in Wash. v. SEC*, 916 F. Supp. 2d 141, 145 (D.D.C. 2013). "In the APA context, summary judgment is the mechanism for deciding whether, as a matter of law, an agency action

is supported by the administrative record and is otherwise consistent with the APA standard of review." *Gulf Restoration Network v. Bernhardt*, 456 F. Supp. 3d 81, 93 (D.D.C. 2020).

The MSA provides for judicial review of "[r]egulations promulgated by the Secretary under this chapter and actions" "taken by the Secretary under regulations which implement a fishery management plan" "if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register." 16 U.S.C. § 1855(f). A district court may not enter injunctive relief, *see id.* § 1855(f)(1)(A), but it may set aside agency action on any ground specified in 5 U.S.C. 706(2)(A)–(D), *see id.* § 1855(f)(1)(B).

Under Section 706(2)(A) of the APA, a reviewing court may set aside agency action if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Agency action is "arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Ass'n v. State Farm Mutual Auto. Ins.*, 463 U.S. 29, 43 (1983). "Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency." *Citizens to Preserve Overton Park Inc. v. Volpe*, 401 U.S. 402, 416 (1971). Moreover, a change in policy or decision is arbitrary and capricious if the agency fails to "provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016).

When considering questions of law, however, courts must "apply[] their own judgment." *Loper Bright*, 144 S. Ct. at 2261. The APA "specifies that courts, not agencies, will decide 'all relevant questions of law' arising on review of agency action—even those involving ambiguous laws—and set aside any such action inconsistent with the law as they interpret it." *Id.* (citation omitted). The APA thus "prescribes no deferential standard for courts to employ in answering those legal questions." *Id.*

## IV. ANALYSIS

The Court first considers whether this controversy is justiciable before proceeding to the merits. The Court concludes that Plaintiffs have standing to challenge rules that regulate their industry, that the controversy is not moot, and that it need not decide whether Plaintiffs' challenge is timely. The Court then proceeds to the merits and determines that Plaintiffs have failed to establish that the agency has violated the MSA.

### A. Justiciability and Timeliness

#### 1. Standing

Defendants contend that Plaintiffs have not demonstrated the necessary Article III standing to bring this lawsuit. *See* Defs.' Mot. Summ. J. at 18–24. Defendants argue that Plaintiffs do not show how their injuries are fairly traceable to Defendants' conduct because the high level of dead discards occurs independently from NMFS rules regulating red snapper. *Id.* at 20. Defendants additionally argue that "Plaintiffs have not established that their hoped-for economic benefits are likely to accrue if they prevail in this suit." *Id.* According to Defendants, an order requiring the agency to include dead discards in the ACL would not necessarily end overfishing, help the red snapper stock rebuild sooner, or increase commercial trip limits. *Id.* at 21. Plaintiffs respond that they have standing because they are harmed by short seasons and low

trip limits, which negatively impact their livelihoods and cause economic injuries.  Pls.' Opp'n.

Mot. Summ. J. at 4–5, ECF No. 15; *see also* Oden Decl., ECF No. 11-3; Cox Decl., ECF No. 11-

4; Gray Decl., ECF No. 11-5; Giambanco Decl., ECF No. 11-6; Speckman Decl., ECF No. 11-7.

Their injuries are traceable to NMFS regulations because Defendants' alleged failure to cabin

dead discards "has led to recent years of overfishing on the red snapper stock and corresponding

harm to stock health and future yield."  *Id.* at 6 (citations omitted).  A favorable decision from

this Court would additionally prompt NMFS to promulgate regulations that address overfishing

and adhere to the governing allocation ratio between the commercial and recreational sectors,

Plaintiffs claim.  *See id.* at 8–9.  The Court concludes that Plaintiffs have standing to bring each

of their claims.

     To demonstrate Article III standing, "a plaintiff must show (i) that he suffered an injury

in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely

caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief."

*TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021) (citing *Lujan v. Defenders of Wildlife*,

504 U.S. 555, 560–61 (1992)).  "To establish injury in fact, a plaintiff must show that he or she

suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and

'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339

(2016) (quoting *Lujan*, 504 U.S. at 560).  "In sum, under Article III, a federal court may resolve

only 'a real controversy with real impact on real persons.'"  *Transunion*, 594 U.S. at 424

(quoting *American Legion v. American Humanist Assn.*, 139 S.Ct. 2067, 2103 (2019).

     The commercial fishermen certainly have standing to challenge regulations limiting their

catch of red snapper.  "The Supreme Court has stated that 'there is ordinarily little question' that

a regulated individual or entity has standing to challenge an allegedly illegal statute or rule under

which it is regulated." *State Nat. Bank of Big Spring v. Lew*, 795 F.3d 48, 53 (D.C. Cir. 2015)

(quoting *Lujan*, 504 U.S. at 561–62); *see also Sierra Club v. E.P.A.*, 292 F.3d 895, 899–900

(D.C. Cir. 2002) (A "petitioner's standing to seek review of administrative action is self-evident"

where "the complainant is 'an object of the action (or forgone action) at issue.'" (quoting *Lujan*,

504 U.S. at 561–62)). As "directly regulated part[ies]," the commercial fishermen "plainly

ha[ve] standing to pursue [their] claims in this case." *Corbett v. Transportation Sec. Admin.*, 19

F.4th 478, 483 (D.C. Cir. 2021).

      For this reason, courts generally conclude that fishermen have standing to challenge rules

that regulate the amount of catch in their fishery. In *Guindon v. Pritzker*, for instance, the court

determined that the plaintiffs had standing because they were "commercial red snapper

fishermen" who "allege that the challenged agency actions led to an overharvesting of red

snapper that threatens their livelihood." 31 F. Supp. 3d 169, 187 (D.D.C. 2014). "It is self-

evident that overharvesting of red snapper" could impact their "interests in the fishery's health,"

the court explained. *Id.* That reasoning is correct and directly applicable here. In addition,

shorter fishing seasons and low trip limits flow directly from the NMFS regulations at issue here.

*See* Pls.' Opp'n. Mot. Summ. J. at 4–5. An order from this Court requiring NMFS to include

dead discards in ACL calculations would also likely alleviate Plaintiffs' economic injuries, at

least to some degree. Counting dead discards against recreational fishers' red snapper ACL

would invariably reduce those fishers' share of landings, presumably leading to a larger share of

landings for commercial fishermen. Courts have repeatedly held that plaintiffs have standing in

analogous circumstances. *See, e.g.*, *N. Carolina Fisheries Ass'n, Inc. v. Gutierrez*, 518 F. Supp.

2d 62, 81–83 (D.D.C. 2007) (finding standing where commercial fishermen challenged

management restrictions on commercial snapper-grouper fishery); *Flaherty v. Bryson*, 850 F.

Supp. 2d 38, 48 (D.D.C. 2012) (finding standing where plaintiffs claimed that their ability to harvest striped bass was harmed by NMFS's failure to adopt adequate conservation measure to protect the Atlantic herring upon which striped bass feed); *Am. Oceans Campaign v. Daley*, 183 F. Supp. 2d 1, 10 (D.D.C. 2000) (finding standing where recreational fishermen alleged that NMFS management measures failed to prevent commercial fishers from damaging fish habitats). The commercial fishermen therefore have standing to pursue their claims in this action.[7]

### 2. Mootness

Defendants additionally argue that the Court lacks jurisdiction over Plaintiffs' claims concerning the 2023 Temporary Rule because those claims are now moot. *See* Defs.' Mot. Partial Summ. J. at 7–12. The 2023 Temporary Rule has expired and was replaced by the 2024 Interim Rule, meaning that any litigation over the 2023 Temporary Rule "would improperly invite the Court to render an advisory opinion without practical consequences." *Id.* at 8. Defendants also point to the settlement agreement in which NMFS committed to a Secretarial Amendment that will be based on a different stock assessment than the one underlying Amendment 43. *See* Defs.' Reply in Supp. Mot. Partial Summ. J. at 2, ECF No. 38. Plaintiffs respond that their claims based on the 2023 Temporary Rule and underlying Amendment 43 regulations are not moot because Amendment 43 remains governing law, and the 2024 Interim Rule is only a temporary measure that must expire after 180 days. *See* Pls.' Mot. Partial Summ. J. at 8. In addition, Plaintiffs posit that the issue should be subject to the mootness exception for actions capable of repetition yet evading review. *Id.* at 9. The Court agrees that the mootness

---

[7] Because the Court determines that the fishermen have standing to pursue their claims, it need not address whether the seafood buyers have standing to pursue the same claims. *See J.D. v. Azar*, 925 F.3d 1291, 1323 (D.C. Cir. 2019) ("It is settled that in a case involving joined, individual plaintiffs bringing a shared claim seeking a single remedy, Article III's case-or-controversy requirement is satisfied if one plaintiff can establish injury and standing.").

exception applies even if expiration of the 2023 Temporary Rule would otherwise moot the controversy.

"A case becomes moot . . . when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91 (2013) (internal quotation omitted). "[T]he mootness doctrine prohibits [a court] from deciding a case if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *J. T. v. Dist. of Columbia*, 983 F.3d 516, 522 (D.C. Cir. 2020) (quoting *Clarke v. United States*, 915 F.2d 699, 701 (D.C. Cir. 1990) (en banc)). Unless and until "it becomes impossible for the court to grant any effectual relief whatever to the prevailing party," however, the case is not moot. *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1135 (D.C. Cir. 2009).

There is an exception to mootness for actions that are "capable of repetition yet evading review." *J. T.*, 983 F.3d at 523. This exception applies where "(1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again." *Id.* (quoting *Weinstein v. Bradford*, 423 U.S. 147, 149 (1975)). "To evade review, the challenged action must be incapable of surviving long enough to undergo Supreme Court review." *United Bhd. of Carpenters & Joiners of Am., AFL-CIO v. Operative Plasterers' & Cement Masons' Int'l Ass'n of U.S. & Canada, AFL-CIO*, 721 F.3d 678, 688 (D.C. Cir. 2013). The Circuit applies a "rule-of-thumb" that "orders of less than two years' duration ordinarily evade review." *LaRouche v. Fowler*, 152 F.3d 974, 978 (D.C. Cir. 1998); *see also J.T.*, 983 F.3d at 524 (observing that an order lasting one year is too short in duration to be fully litigated before its expiration). An action is "capable of repetition" where there is "a reasonable degree of

likelihood that th[e] issue will be the basis of a continuing controversy between the[] two parties." *Pharmachemie B.V. v. Barr Lab'ys, Inc.*, 276 F.3d 627, 633 (D.C. Cir. 2002) (quoting *Cent. Soya Co. v. Consol. Rail Corp.*, 614 F.2d 684, 689 (7th Cir. 1980)). Courts focus not on "whether the precise historical facts that spawned the plaintiff's claims are likely to recur," but rather on "whether the legal wrong complained of by the plaintiffs is reasonably likely to recur." *Del Monte Fresh Produce Co. v. United States*, 570 F.3d 316, 324 (D.C. Cir. 2009). "In estimating the likelihood of an event's occurring in the future, a natural starting point is how often it has occurred in the past." *United Bhd. of Carpenters*, 721 F.3d at 688 (quoting *Clarke*, 915 F.2d at 704).

The challenged actions here satisfy both prongs of this test. First, it is indisputable that the 2023 Temporary Rule was "in its duration too short to be fully litigated prior to its cessation or expiration." *J. T.*, 983 F.3d at 523. NMFS published the rule in the Federal Register on May 25, 2023, and it was effective from July 1 until November 30 of that year. AR 000001. The agency then published the 2024 Interim Rule on June 14, 2024. AR 012494. This falls within the one-to-two-year duration the Circuit has found to evade review. *See LaRouche*, 152 F.3d at 978; *see also J.T.*, 983 F.3d at 524. The pace of briefing in this case further demonstrates that the rule's duration was too short for its legality to be litigated by the time it expired. Plaintiffs filed their Complaint on June 16, 2023, just weeks after NMFS published the 2023 Temporary Rule in the federal register. Yet the parties were only partway through summary judgment briefing when the rule expired.

So too is there "a reasonable degree of likelihood that th[e] issue will be the basis of a continuing controversy between the[] two parties." *Pharmachemie B.V.*, 276 F.3d at 633. The parties do not dispute that Amendment 43, and its omission of dead discards from the ACL,

remains in effect. *See* AR 010022. Although NMFS has committed to a new rule "implementing a Secretarial Amendment to stop overfishing on the South Atlantic red snapper stock under 16 U.S.C. § 1854(c) & (e)," Stipulation of Settlement, *Gray v. Raimondo*, No. 24-cv-1431 (Aug. 20, 2024), as Plaintiffs point out, NMFS has multiple options to address red snapper overfishing, meaning that there is no reason to believe that the promised FMP amendment would require inclusion of dead discards in the ACL. *See* Pls.' Reply Supp. Mot. Partial Summ. J. at 3, ECF No. 37. NMFS, for its part, does not commit to making this change in its proposed amendment. *See* Defs.' Reply Supp. Mot. Partial Summ. J. at 2–4.[8]

Further evidence of the likelihood to recur can be found in the frequency with which NMFS has deployed Amendment 43 in the past. *See United Bhd. of Carpenters*, 721 F.3d at 688. NMFS implemented Amendment 43 through temporary regulations every year from 2019 through 2023. *See* 84 Fed. Reg. 7827 (Mar. 5, 2019); 85 Fed. Reg. 36165 (June 15, 2020); 86 Fed. Reg. 30393 (June 8, 2021); 87 Fed. Reg. 31190 (May 23, 2022); AR000001–02. It is therefore likely that NMFS will continue to use the same methodology in future years and continue to omit dead discards from the ACL.

Courts in this Circuit have held similarly, and the cases Defendants cite do not counsel to the contrary. The court in *Guindon* observed that "[t]he NMFS actions [p]laintiffs challenge are precisely the sort of agency actions for which the 'capable of repetition yet evading review' exception exists" because they tend to recur annually, and fishing seasons can be rather short-lived. 31 F. Supp. 3d at 188. Defendants nonetheless assert that other courts have found

---

[8] The parties filed a notice indicating that NMFS has proposed Amendment 59 to the FMP, which would significantly revise the ACL. *See* Joint Notice of Filing Proposed Rule, ECF No. 41; Suppl. Joint Notice Regarding Proposed Rule for Secretarial Amendment 59, ECF No. 42. As that amendment has not been finalized, however, the relevant provisions of Amendment 43 remain in effect.

mootness where the challenged rules expired or were revised, *see* Defs.' Mot. Partial Summ. J. at 8–9, but this case is dissimilar because the underlying regulation—Amendment 43—remains in legal effect.  In *New York v. Raimondo*, for instance, the plaintiffs challenged commercial fishing quotas, but NMFS later revised its longstanding rule governing allocation.  No. 1:19-CV-09380-MKV, 2021 WL 1339397, at *1 (S.D.N.Y. Apr. 9, 2021).  While the temporary rules setting quotas for the 2020 and 2021 fishing season had also expired, *see id.*, there is no indication that the case would have been moot if—like here—the perennial allocation rule remained in effect.  So too in *Gulf of Maine Fisherman's Alliance v. Daley* did NMFS adopt permanent FMP amendments that overrode the challenged regulation.  292 F.3d 84, 87 (1st Cir. 2002); *see also Oceana, Inc. v. Locke*, 831 F. Supp. 2d 95, 124 (D.D.C. 2011) (observing that courts often find challenges to FMP amendments moot after "NMFS subsequently took the requested action through *a new amendment* or framework adjustment while the case was pending" (emphasis added)).  Here, NMFS has not promulgated an amendment to the Snapper-Grouper FMP that includes dead discards within the ACL, and so these cases are inapplicable.

    The Court makes one limited caveat, however.  To the extent that Plaintiffs continue to challenge the NMFS regulations because the rules empirically have not prevented overfishing, those claims are now moot.  *See* Pls.' Mot. Summ. J. at 31–34.  NMFS has agreed, in a lawsuit involving two of the Plaintiffs here, to publish "a Secretarial Amendment to stop overfishing on the South Atlantic red snapper stock."  Stipulation of Settlement, *Gray v. Raimondo*, No. 24-cv-1431 (Aug. 20, 2024).  In that respect, there is no longer a real controversy between the parties for the Court to resolve, as by granting relief to Plaintiffs, the Court would simply order Defendants to take action they are already legally obligated to take.  The Court thus cabins Plaintiffs' arguments regarding 16 U.S.C. § 1853(a)(15) to the assertion that Defendants'

practices are conceptually incapable of preventing overfishing in a manner that violates the statute. *See* Pls.' Mot. Summ. J. at 35–36; Pls.' Mot. Partial Summ. J. at 26–27. Plaintiffs appear to recognize this limitation in their supplemental briefing. *See* Pls.' Opp'n Mot. Partial Summ. J. at 13, ECF No. 36 (noting that the outcome of Claims 2 and 5 "does not turn on whether overfishing occurs as a result of using NMFS's annual catch limit for South Atlantic red snapper").

In sum, the Court finds that even assuming Plaintiffs' challenge to the Temporary 2023 Rule and Amendment 43 is moot, the exception to mootness nonetheless applies. The Court may therefore exercise jurisdiction over the case.

### 3.   Timeliness

Defendants next argue that Plaintiffs' challenge to the reasoning in Amendment 43 is time-barred because they did not challenge that rule within the 30-day window imposed by 16 U.S.C. § 1855(f). *See* Defs.' Mot. Summ. J. at 24–28. Plaintiffs respond that "Congress amended the [MSA] in 1990 explicitly to allow cases such as this one to proceed," Pls.' Opp'n Mot. Summ. J. at 13, and that they may challenge Amendment 43 by filing a lawsuit based on the 2023 Temporary Rule because the latter is an action taken under the amendment, *see id.* at 19–24. The Court ultimately need not decide whether Plaintiffs' lawsuit is timely.

While Courts consider challenges under the MSA using many of the same standards as those brought under the APA, *see* 16 U.S.C. § 1855(f)(1)(A)–(B), the MSA contains a distinct statutory scheme for the timing of those challenges. The MSA provides that "[r]egulations promulgated by the Secretary under this chapter and actions described in paragraph (2) shall be subject to judicial review . . . if a petition for such review is filed within 30 days after the date on which the regulations are promulgated or the action is published in the Federal Register, as

applicable." *Id.* § 1855(f)(1).  That provision defines the relevant "actions" as those "taken by the Secretary under regulations which implement a fishery management plan, including but not limited to actions that establish the date of closure of a fishery to commercial or recreational fishing." *Id.* § 1855(f)(2).

The relevant question here is whether a plaintiff can challenge a regulation that implements an FMP whenever the Secretary takes an "action" under that regulation.  Defendants naturally argue that a plaintiff may not do so.  *See* Defs.' Reply Supp. Mot. Summ. J. at 5–11, ECF No. 17.  One natural reading of the statute's text is that a regulation is subject to review within 30 days, and that an action is subject to review within 30 days as well.  The provision's framing of the time limit as within 30 days of "*the* regulation" or "*the* action" implies this parallel structure, and Plaintiffs' reading may rewrite the text to render a regulation reviewable "within 30 days after the date on which the regulations are promulgated or *any subsequent action taken under those regulations* is published in the Federal Register."  16 U.S.C. § 1855(f).  In addition, reopening the limitations period whenever NMFS takes action pursuant to a regulation may "render the 30-day limitations period for regulations under 16 U.S.C. § 1855(f)(1) virtually irrelevant."  Defs.' Reply Supp. Mot. Summ. J. at 9; *see also Oceana, Inc. v. Locke*, 670 F.3d 1238, 1243 n.* (D.C. Cir. 2011) (noting that "the 30-day deadline in § 1855(f) for seeking judicial review impl[ies] a congressional preference for immediate resolution.").

Yet the opinions of two courts of appeals, on which Plaintiffs rely, provide a basis to believe that Congress did intend to re-open underlying regulations to review whenever NMFS takes subsequent action under the regulation.  *See* Pls.' Opp'n Mot. Summ. J. at 22.  In *Oregon Trollers Association v. Gutierrez*, the Ninth Circuit examined the statute's legislative and amendment history to determine whether the plaintiffs there could challenge a regulation sixteen

years after NMFS published it.  452 F.3d 1104, 1112 (9th Cir. 2006).  The court first observed

that in 1989, the Fourth Circuit held—under a previous version of the statute—that fishermen

could not attack a regulation establishing an annual catch limit by challenging the Secretary's

order closing the fishing season.  *See id.* at 1113 (discussing *Kramer v. Mosbacher*, 878 F.2d 134

(4th Cir. 1989)).  The court explained that "Congress amended § 1855(f)(1) in 1990 specifically

in order to change the result in *Kramer*," *id.*, and emphasized Senate and House reports to that

effect, *see id.* at 1114.  The Ninth Circuit further reasoned that the statute allows for a lawsuit to

be filed within 30 days of "the date on which the regulations are promulgated *or* the action is

published in the Federal Register," inferring that the disjunctive "or" "indicates that a petition is

timely if it is filed within thirty days of either promulgation of the regulation *or* publication of

the action." *Id.* at 1113.  The Eleventh Circuit has held similarly.  *See Gulf Fishermen's Ass'n v.*

*Gutierrez*, 529 F.3d 1321, 1323 (11th Cir. 2008).

 Because the Court determines that Plaintiffs' claims fail on the merits, it ultimately need

not determine whether the lawsuit was timely.  The Supreme Court has made clear that a timing

rule becomes jurisdictional only when Congress makes a "clear statement" that it is so.  *Wilkins*

*v. United States*, 598 U.S. 152, 158 (2023); *see also Boechler, P.C. v. Comm'r of Internal*

*Revenue*, 596 U.S. 199, 203 (2022) (providing that a court will "treat a procedural requirement as

jurisdictional only if Congress 'clearly states' that it is.").  As a result, "most time bars are

nonjurisdictional."  *Wilkins*, 598 U.S. at 158 (quoting *United States v. Kwai Fun Wong*, 575 U.S.

402, 410 (2015)).  The text of § 1855(f) "does not clearly mandate the jurisdictional reading,"

*Boechler*, 596 U.S. at 204, and as such does not deprive the Court of jurisdiction even if Plaintiffs' lawsuit were untimely.[9]

## B. Merits

With preliminary issues resolved, the Court proceeds to evaluate the merits of Plaintiffs' claims. The Court first considers whether exclusion of dead discards from the ACL violates the MSA's definition of "catch." It next examines whether the practice categorically prevents NMFS from complying with its statutory obligations to prevent overfishing. Finally, the Court considers whether exclusion of dead discards from the ACL results in a de facto reallocation of fishing privileges in violation of the MSA. As "Plaintiffs' claim remains a statutory one," Pls.' Opp'n Mot. Summ. J. at 25, the Court's primary task is to determine whether NMFS's exclusion of dead discards from the ACL contravenes Congress's instructions in the MSA.[10]

The parties additionally debate whether the 2024 Interim Rule is subject to the same statutory requirements as Amendment 43 and the 2023 Temporary Rule. The Secretary is empowered to "promulgate emergency regulations or interim measures necessary to address the emergency or overfishing." 16 U.S.C. § 1855(c)(1). Any regulation or measure is "treated as an amendment to such plan for the period in which such regulation is in effect." *Id.* § 1855(c)(3). Defendants assert that "[b]ecause NMFS promulgated the 2024 Interim Rule under a different

---

[9] Even if § 1855(f) were jurisdictional in nature, the Court may nonetheless "assume hypothetical statutory jurisdiction" to consider the merits here. *Am. Hosp. Ass'n v. Azar*, 964 F.3d 1230, 1246 (D.C. Cir. 2020) (citing *Kramer v. Gates*, 481 F.3d 788, 791 (D.C. Cir. 2007)) (emphasis removed).

[10] Plaintiffs do not claim that NMFS failed to base conservation and management measures on the best scientific evidence available. *See* Pls.' Reply at 25–26 (disclaiming any claims under National Standard 2). Plaintiffs also do not argue that the agency acted unlawfully by combining the SSC's recommended landings and dead discards when determining that the ACL of 42,510 fish fell within the SSC's fishing level recommendations. *See generally* Pls.' Mot. Summ. J.; Pls.' Reply.

statutory authority than those used for issuing an FMP and its implementing regulations, it is not subject to the same requirements as an FMP."  Defs.' Mot. Partial Summ. J. at 14.  Plaintiffs respond that the 2024 Interim Rule is subject to the general requirements of the MSA, in part because another provision states that interim measures requested by a regional council should be "otherwise in compliance with the provisions of this chapter."  16 U.S.C. § 1854(e)(6); *see also* Pls.' Opp'n Mot. Partial Summ. J. at 12.  According to Plaintiffs, the 2024 Interim Rule suffers from the same infirmities as Amendment 43 and the 2023 Rule because it does not account for dead discards within the catch limit.  *See id.* at 14.; *see also* Pls.' Mot. Partial Summ. J. at 9 ("[O]n a practical level, the merits analysis is the same across all the challenged actions in this case—the 2024 Temporary Rule, the 2023 Temporary Rule, and the Amendment 43 regulations.").  Because the merits analysis is the same across each of these three rules, the Court will assume, without deciding, that NMFS must adhere to the statutory requirements of 16 U.S.C. § 1853 governing fishery management plans when it publishes rules on an emergency or interim basis under 16 U.S.C. § 1855(c).

### 1. Definition of "Catch"

Plaintiffs claim that NMFS has failed to implement an annual catch limit by excluding dead discards from Amendment 43's annual catch limit, and that this violates Congress's instruction that FMPs shall "establish a mechanism for specifying annual catch limits . . . at a level such that overfishing does not occur in the fishery."  Pls.' Mot. Summ. J. at 20 (quoting 16 U.S.C. § 1853(a)(15)).  According to Plaintiffs, the word "catch" includes both landings and dead discards, *id.* at 22, and the word "limit" means a value not to be exceeded, *id.* at 23.  Defendants assert that the MSA does not define "annual catch limit" and that Amendment 43 and the 2023 Temporary Rule comply with the MSA's requirements on their face.  *See* Defs.' Mot.

Summ. J. at 29.  The Court agrees with Defendants that Congress did not define "annual catch limit" to include dead discards, and that Plaintiffs thus cannot show that the agency failed to act "in accordance with law."  5 U.S.C. § 706(2)(A).

A recent D.C. Circuit decision largely resolves this issue.  In *A.P. Bell Fish Co., Inc. v. Raimondo*, commercial fishers challenged an FMP amendment, arguing in part that the amendment "lack[ed] the required catch limits and accountability measures."  94 F.4th 60, 63 (D.C. Cir. 2024).  The plaintiffs there asserted that the amendment unlawfully "set the overfishing limit in terms of landings, not catch."  *Id.* at 65.  The D.C. Circuit observed that the MSA "does not define 'catch'" and that "[t]he overfishing limit recommended by the Council accounts for all sources of mortality, including bycatch, because the stock assessment factors in that mortality."  *Id.* (quotations omitted).  "Because the annual catch limits are based on that overfishing limit, the annual catch limits account for bycatch in the same fashion."  *Id.*  The court continued to conclude that "Section 1853(a)(15) requires only the establishment of [annual catch limits and accountability measures] such that overfishing does not occur, and does not require the further step of setting an overfishing limit . . . that more directly accounts for bycatch."  *Id.* (quotations omitted).

This reasoning is controlling here.  Plaintiffs seek to distinguish *A.P. Bell* because the court there "was examining whether a non-statutory value, the overfishing limit (a precursor value to the annual catch limit), must be set in terms of total catch."  Pls.' Opp'n Mot. Partial Summ. J. at 10.  Yet because "the annual catch limits are based on th[e] overfishing limit," *see*

Pls.' Mot. Partial Summ. J. at 22, it would make little sense for the Circuit to permit NMFS to omit dead discards from the OFL but require the agency to include dead discards in the ACL.[11]

        Plaintiffs' remaining arguments are unavailing. Congress's use of the term "landings" elsewhere in the statute does not imply that it intended "catch" to comprise landings and bycatch. *See* Pls.' Mot. Summ. J. at 22-23. To the contrary, Congress was plainly aware of the concept of bycatch, *see* 16 U.S.C. § 1802(2), but declined to specify that an annual catch limit must account for it, *see* 16 U.S.C. § 1853(a)(15). Instead, Congress merely instructed that the ACL must be set "at a level such that overfishing does not occur." *Id.* In addition, although NMFS guidelines do include dead discards within the definition of "catch," *see* 50 C.F.R. § 600.310(f)(1)(i), those guidelines do not have force and effect of law, *see* 16 U.S.C. § 1851(b). Plaintiffs provide no other indicia of what Congress meant by "annual catch limit" and therefore cannot show that NMFS violated Congress's instructions by omitting dead discards from the calculation.

        The Court also observes that NMFS's approach is not entirely unreasonable. The South Atlantic Council, the agency, and the entities' scientific committees repeatedly found a high level of uncertainty in dead discard estimates. *See* AR 007174; AR 010022; AR 002432. As such, "discard estimates . . . carr[ied] too high a degree of uncertainty to allow their use for management action." AR 009958. This uncertainty in the number of dead discards also prompted the Council's SSC to conclude that it was unable to provide an ABC recommendation for red snapper. AR 009957. It was thus reasonable for NMFS to set fishing limits using landed fish only, as it concluded that counting dead discards was impractical.

---

[11] Plaintiffs also argue that the Circuit's decision in *A.P. Bell* is "was conceptually incoherent and appears premised on a factual misunderstanding." Pls.' Opp'n Defs.' Mot. Partial Summ. J. at 10. As this Court must follow D.C. Circuit precedent, this is the incorrect forum to raise this critique.

Because Defendants have not violated the MSA by excluding bycatch and dead discards from the annual catch limit, but rather accounting for those figures elsewhere in their considerations, they are entitled to summary judgment on Counts One and Four of the Supplemental Complaint.

### 2. Prevention of Overfishing

Plaintiffs claim that the methodology employed in Amendment 43 not only fails to limit the catch, but that it is categorically incapable of preventing overfishing of South Atlantic red snapper as the MSA requires. *See* Pls.' Mot. Summ. J. at 35–36. According to Plaintiffs, setting the ACL using landings alone will inevitably result in overfishing. *See* Pls.' Opp'n Mot. Partial Summ. J. at 14. Defendants argue that NMFS reasonably concluded that setting the ACLs in the temporary rules pursuant to Amendment 43 would prevent overfishing, *see* Defs.' Mot. Summ. J. at 41–43, and that this level is consistent with the SEDAR 73 stock assessment, *id.* at 43–46. The Court does not agree that excluding dead discards from the ACL categorically prevents NMFS from preventing overfishing.

The most coherent form of Plaintiffs' argument appears in their briefing on the cross-motions for partial summary judgment. *See* Pls.' Mot. Partial Summ. J. at 26–27. According to Plaintiffs, South Atlantic red snapper would experience overfishing even if the agency set the ACL at zero. *Id.* at 26. It is thus "not a credible interpretation of the [MSA] to say that a landings-only annual catch limit for South Atlantic red snapper, which excludes the most important source of fishing mortality, is what Congress intended when it required catch limits to be set 'at a level such that overfishing does not occur.'" *Id.* at 27 (quoting 16 U.S.C. § 1853(a)(15)). "This is true as a conceptual matter, and does not depend on the specifics of exactly how many dead discards occur in a given year." *Id.* at 27; *see also* Pls.' Reply at 38

(arguing that Amendment 43 "established a mechanism for annual catch limits that simply is incapable of preventing overfishing").  Plaintiffs thus challenge the formula the SSC, Council, and NMFS use rather than its application to the specific data here.

Plaintiffs' argument boils down to the assertion that by excluding dead discards from the ACL, the OFL will always be exceeded, and that this method violates § 1853(a)(15) in all cases. There is no reason, however, to believe that NMFS cannot address overfishing when excluding dead discards from the ACL.  This is so because NMFS regulations allow the agency to prevent overfishing "'as long as estimates of bycatch and any other fishing mortality not accounted for in the landings are incorporated into the determination of' the annual catch limit." *A.P. Bell Fish Co., Inc. v. Raimondo*, No. 22-cv-1260, 2023 WL 6159985, at \*17, n.10 (D.D.C. Sept. 21, 2023), *rev'd on other grounds*, 94 F.4th 60 (D.C. Cir. 2024) (quoting 50 C.F.R. § 600.310(f)(3)(i)).  The agency's approach to the perennial ACL found in Amendment 43 demonstrates this mechanism. The SSC's initial OFL incorporated both landed fish and discarded fish, and the committee similarly based its recommended ABC on these numbers.  *See* AR 009956; AR 005053.  The initial figures therefore accounted for dead discards when the scientific committee provided its recommendation to the South Atlantic Council and eventually NMFS.  The South Atlantic Council and NMFS then formulated an ACL based on the landings portion of the ABC but declined to count discards in the same figure because it found discards difficult to track and implement as part of a management action.  *See* AR 009958; AR 007173.  Yet because the ACL is based on the ABC and OFL, which both account for dead discards, inputting a higher number for expected bycatch at the beginning of this process would naturally lead to a lower landings-only ACL at the end of the process.  Where a scientific committee places the OFL at 56,000 fish, and expects 37,000 dead discards, it stands to reason that an ACL of 19,000 landed fish would

not exceed the OFL.  *See* AR 005053.  Plaintiffs are thus incorrect that this "mechanism . . . simply is incapable of preventing overfishing."  Pls.' Reply at 38.[12]

It is true that the numbers in this case greatly skew these metrics.  In May 2016, when the SSC recommended an OFL of 53,000 fish for 2017 and 56,000 fish for 2018, *see* AR 003975, the prior year saw approximately 274,000 dead discards even though NMFS set the catch limit at zero, AR 006861.  Recall that the OFL is set at a level necessary to prevent overfishing, *see* 50 C.F.R. § 600.310(e)(2)(i)(D), and that the ABC is set accounting for "scientific uncertainty in the OFL," *id.* § 600.310(f)(2)(ii).  Given the high number of dead discards in this specific instance, it may well be that any landings-only ACL above zero would fail to address overfishing, given that the number of dead discards would exceed the OFL and ABC many times over.

Yet, again, this is not what Plaintiffs argue.  Plaintiffs assert that "[t]he nature of Claims 2 and 5 is such that the outcome does not turn on whether overfishing occurs as a result of using NMFS's annual catch limit for South Atlantic red snapper."  Pls.' Opp'n Mot. Partial Summ. J. at 13.  Plaintiffs do not argue, for instance, that "NMFS set the wrong numerical value for the

---

[12] Plaintiffs suggest in passing—while discussing their argument regarding reallocation of fishing privileges—that NMFS could require recreational fishers to "stop fishing for other snapper-grouper species once they hit their red snapper catch limit."  Pls.' Opp'n Mot. Summ. J. at 43.  Given that dead discards often result from fishermen targeting species that co-occur with red snapper, *see* AR 006981, it is conceivable that this policy could ameliorate overfishing of red snapper.  Yet Plaintiffs do not explore this issue in any depth, do not make their suggestion in relation to the overfishing claim, and do not explore any legal basis for it.  Plaintiffs target the South Atlantic red snapper ACL specifically and make no argument as to the ACLs set for other fish in the Snapper-Grouper FMP.

Plaintiffs additionally suggest that the agency's approach is unlawful because the inclusion of dead discards in upstream values does not create a firm limit on the number of dead discards.  *See* Pls.' Mot. Partial Summ. J. at 19–23.  Plaintiffs suggest, for instance, that projected dead discards have "no regulatory effect on the water." *Id.* at 19.  This argument presupposes that the MSA requires the ACL to include dead discards, a notion that the D.C. Circuit has rejected.  *See A.P. Bell*, 94 F.4th at 65.

catch limit in the 2024 Temporary Rule . . . because the value used fails to prevent overfishing." *Id.* at 14 n.8; *see also* Pl.'s Reply at 35 (rejecting the agency's "framing" of the issue "as reasonableness review of an agency management action").  "Rather," Plaintiffs explain, "the claim is that NMFS's annual catch limit is *conceptually incapable* of being set 'at a level such that overfishing does not occur.'"  Pls.' Opp'n Mot. Partial Summ. J. at 13 (quoting 16 U.S.C. § 1853(a)(15)).  The mechanism, in other words, is flawed."[13]  *Id.* at 13.  But as the Court has explained, the mechanism employed to calculate the ACL is not inherently faulty, as it can effectively account for dead discards when the OFL and ABC are calculated, shrinking the ACL for landed fish accordingly.  To the extent that the Council and NMFS may have incorrectly or unreasonably applied that formula here, however, Plaintiffs rather clearly disavow that form of challenge to the agency's rules.[14]

Plaintiffs may also prove too much by arguing that NMFS's actions are unlawful because red snapper would experience overfishing even if the agency set the ACL at zero.  *See* Pls.' Mot. Summ. J. at 35–36; Pls.'Mot. Partial Summ. J. at 26.  By this logic, the agency would act unlawfully no matter what approach it took to the ACL in Amendment 43 and the subsequent temporary rules.  Assume for the moment an OFL of 56,000 fish, where the SSC expects dead discards totaling 100,000 fish.  Under the methodology employed in the process of formulating Amendment 43, the landings portion of the OFL and ABC would be set at zero, and the landings-only ACL would similarly be zero.  It is not apparent how NMFS could neglect its

---

[13] Plaintiffs reaffirmed at the motions hearing that they do not challenge the specific numbers NMFS used here, but rather the structure and mechanism NMFS uses to set them.

[14] Furthermore, to the extent Plaintiffs assert that NMFS has empirically failed to prevent overfishing, those claims are now moot because NMFS is already obligated to remedy that harm. *See supra* in Section IV.A.2.

obligation to "specify[] annual catch limits . . . such that overfishing does not occur" by prohibiting the catch in its entirety.  16 U.S.C. § 1853(a)(15).

Because NMFS can prevent overfishing even when it excludes dead discards from the ACL, Defendants are entitled to summary judgment on Counts Two and Five of the Supplemental Complaint.

### 3.  De Facto Reallocation

Plaintiffs also claim that by failing to count the recreational sector's dead discards, the NMFS regulations at issue amount to a de facto reallocation of fishing privileges away from commercial fishermen in violation of the MSA.  *See* Pls.' Mot. Summ. J. at 36–40.  Plaintiffs additionally argue that NMFS has failed to demonstrate that this reallocation is "'fair and equitable' and 'reasonably calculated to promote conservation,' as required under National Standard 4."  *Id.* at 39.  Defendants claim that the regulations do not amount to an allocation and that recreational fishermen do not benefit from any reallocation because they may not retain red snapper outside the fishing season.  *See* Defs.' Mot. Summ. J. at 46–48.  Defendants also assert that even if the regulations resulted in reallocation, the allocation would remain fair and equitable, as well as reasonably calculated to promote conservation.  *Id.* at 48–54.  The Court concludes that Amendment 43, the 2023 Temporary Rule, and the 2024 Interim Rule do not allocate fishing privileges or harvest restrictions.  To the extent that these regulations do allocate fishing privileges or harvest restrictions, however, they do so in a manner that is fair and equitable and reasonably calculated to promote conservation.

National Standard 4 provides that

If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out

in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(4). In addition, where "rebuilding plans or other conservation and management measures which reduce the overall harvest in a fishery are necessary," an FMP must "allocate, taking into consideration the economic impact of the harvest restrictions or recovery benefits on the fishery participants in each sector, any harvest restrictions or recovery benefits fairly and equitably among the commercial, recreational, and charter fishing sectors in the fishery." *Id.* § 1853(a)(14). The MSA does not define the term "allocation," but NMFS defines it as "a direct and deliberate distribution of the opportunity to participate in a fishery among identifiable, discrete user groups or individuals" and excludes "incidental allocative effects" of management measures. 50 C.F.R. § 600.325(c)(1). The MSA also does not define "fishing privileges," but it does define "fishing" in part as "the catching, taking, or harvesting of fish," any attempt to do so, or "any other activity which can reasonably be expected to result in the catching, taking, or harvesting of fish." 16 U.S.C. § 1802(16).

As Plaintiffs recognize, the MSA's definition of the word "fishing" "does not on its own answer whether dead discards are included." Pls.' Reply Supp. Mot. Summ. J. at 42. As such, the MSA does not say whether dead discards must be included in the notion of "fishing privileges" under National Standard 4 either. *See* 16 U.S.C. § 1802(16); 50 C.F.R. § 600.325. Plaintiffs argue, however, that Congress's intention for the word "harvest" to include dead discards can be found within the definition of "bycatch." Pls.' Reply Supp. Mot. Summ. J. at 42. Because "bycatch" comprises fish "harvested in a fishery . . . and includes economic discards and regulatory discards," Plaintiffs argue, this means the "harvest[ing]" of fish always includes dead discards. *Id.* (quoting 16 U.S.C. § 1802(2)). And because the definition of "fishing" includes "harvesting" fish, then "fishing" must include harvesting dead discards as well. *Id.* But

when Congress defined "bycatch" to include dead discards, it did not state that the word "harvested" includes dead discards, as well.  *See* 16 U.S.C. § 1802(2).  Nor does the MSA define "fishing" or "fishing privileges" to include discards.  *See* 16 U.S.C. § 1802(16).  The MSA therefore does not require NMFS to consider shifts in the ratio of dead discards between the commercial and recreational sectors to be "allocat[ion] or assign[ment of] fishing privileges among various United States fishermen" under National Standard 4.  16 U.S.C. § 1851(a)(4).

Nor can the rules at issue here be said to "allocate" fishing privileges or harvest restrictions under National Standard 4 and 16 U.S.C. § 1853(a)(14).  *See* Defs.' Mot. Summ. J. at 46–48.  Allocation is a deliberate act—in other words, one does not "allocate" by accident or inactivity.  *See* Allocate, Oxford English Dictionary (2d ed. 1989) ("[T]o make a distribution or apportionment of (something) among several recipients, responsible parties, etc."); *see also* 50 C.F.R. § 600.325(c)(1) (defining allocation of fishing privileges as "a direct and deliberate distribution"); *Nat'l Coal. For Marine Conservation v. Evans*, 231 F. Supp. 2d 119, 131 (D.D.C. 2002) (holding that a fishing closure with "incidental allocative effects" was not allocative because it did "not directly distribute fishing privileges, quotas or ocean areas among different groups of fishers").  NMFS and the South Atlantic Council allocated red snapper between the commercial and recreational sectors through FMP Amendment 25 in 2012 when they set the commercial and recreational allocations of red snapper at 28.07 percent and 71.93 percent, respectively.  *See* AR 010060; 77 Fed. Reg. 15916, 15924.  Neither the Council nor NMFS has allocated fishing privileges, harvest restrictions, or recovery benefits simply because dead discards have incidentally risen, albeit by a significant amount.  No further allocation of allowable catch has taken place in the years since Amendment 25 was published, and this longstanding allocation has not been revisited in more than a decade.

36

In addition to this allocation ratio, the number of permitted landed fish has also remained largely unchanged for a decade. Fishermen harvested approximately 42,510 fish in 2014, and NMFS set the ACL at that number when fishing resumed in 2017. AR 010260; AR 010022. NMFS again used this number as the perennial ACL in Amendment 43. AR 010022. The only decrease in the ACL came in 2024 when NMFS reduced the allotments for both the commercial and recreational sectors. AR 000001–02. It can hardly be said that any of these actions constituted an allocation of catch from one sector to the other.

Plaintiffs cite *Guindon* for the proposition that de facto allocations are unlawful. *See* Pls.' Mot. Summ. J. at 38–39. In that case, the FMP established a "51/49 split" between the commercial and recreational sectors. *Guindon*, 31 F. Supp. 3d at 200. "[D]espite reliable evidence that the [recreational] sector had already exceeded its quota," however, NMFS decided "to reopen the fall season." *Id.* at 201. The district court concluded that "NMFS essentially guaranteed that the actual catch allocation would skew widely from the 51/49 allocation," and that this contravened 16 U.S.C. § 1854(b), which "requires consistency between the FMP and implementing regulations." *Id.* at 200. That case is inapposite here for two reasons. First, the district court in *Guindon* held that NMFS violated § 1854(b) by failing to adhere to the relevant FMP, whereas Plaintiffs here rely on different theories under National Standard 4 and § 1853(a)(14). Second, in *Guindon*, NMFS effectively increased the recreational sector's catch allocation by extending the recreational fishing season. Here, however, NMFS has taken no action to increase the number of fish that recreational fishers may land in comparison to those allocated to the commercial sector.

Even assuming that NMFS allocated fishing privileges, harvest restrictions, or recovery benefits by failing to include dead discards in the ACLs contained in Amendment 43 and the

temporary regulations, the Court concludes that this allocation would be fair and equitable and reasonably calculated to promote conservation in a manner compliant with both National Standard 4 and § 1853(a)(14).  The record demonstrates that NMFS has consistently "acted to constrain the recreational fishery to its ACL by establishing shorter recreational fishing seasons." Defs.' Mot. Summ. J. at 51.  Although the 2017 season lasted six days, *see* AR 010260, the agency shortened this season to just two days in 2023, *see* AR 000001–02.  The 2024 recreational fishing season was cut to a single day, the shortest in at least seven years.  *See* SAR 012496.  Recreational fishers have also been consistently limited to one fish per person per day, such that a recreational fisher could land only one red snapper during the 2024 season.  *See* SAR 012496 ("[T]he recreational bag limit is 1 fish per person."); *see also* AR 000002 ("[T]he recreational bag limit is one red snapper per person, per day.").  In contrast, during the 2023 season commercial fishers were afforded a commercial trip limit of 75 pounds of red snapper, gutted weight, amounting to roughly nine fish per trip.  AR 000001; *see also* SAR 012496 ("The commercial ACL is calculated using the average of the estimated annual average weights of red snapper commercially landed from 2017 to 2019, which is 8.67 lb (3.93 kg) per fish, as derived from SEDAR 73.").  The same commercial trip limit obtained in the 2024 rule, and NMFS estimated that the commercial season would remain open for 35 days.  SAR 012496.

The Court concludes that the strict limits on recreational catch, coupled with NMFS's management-based rationale for excluding dead discards from the ACL, demonstrate that any allocation would be fair and equitable as the MSA requires.  The agency's guidelines provide that allocation of fishing privileges must be "rationally connected to the achievement of [optimum yield] or with the furtherance of a legitimate FMP objective."  50 C.F.R. § 600.325(c)(3)(i)(A).  In addition, "allocation of fishing privileges may impose a hardship on

one group if it is outweighed by the total benefits received by another group or groups." *Id.*
§ 600.325(c)(3)(i)(B).  The agency has a relatively low burden to establish that hardships will
lead to the greater good.  *See C & W Fish Co. v. Fox, Jr.*, 931 F.2d 1556, 1563 (D.C. Cir. 1991).
In addition, "courts have declined to second-guess the Secretary's judgment simply because the
provisions of a[n] FMP or a plan allocation 'have a greater impact upon' one group or type of
fishermen." *N. Carolina Fisheries*, 518 F. Supp. 2d at 89 (citing *Nat'l Fisheries Inst., Inc. v.
Mosbacher*, 732 F. Supp. 210, 225 (D.D.C. 1990)); *see also Alliance Against IFQs v. Brown*, 84
F.3d 343, 350 (9th Cir. 1996) ("[T]he Secretary is allowed, under [National Standard Four], to
sacrifice the interests of some groups of fishermen, for the benefit as the Secretary sees it of the
fishery as a whole.").

  The record here demonstrates that both commercial and recreational fishermen
experience hardships from low ACLs, and that adjusting the Amendment 25 allocation ratio to
account for dead discards may inequitably eliminate the recreational red snapper season.
Furthermore, the agency explained in relation to Amendment 43 that the South Atlantic Council
"established allocations for red snapper using a formula that balanced long-term catch history
with recent catch history, rather than estimates of economic value."  AR 010026.  "This
approach," NMFS explained, "was determined as the most fair and equitable way to allocate
fishery resources by the Council."  *Id.*; *see also* SAR 012316 (repeating the rationale regarding
the 2024 Interim Rule).  The Court concludes based on these explanations that any de facto
reallocation because of increased recreational dead discards would remain fair and equitable.

  The record also demonstrates that any allocation resulting from exclusion of dead
discards would be "reasonably calculated to promote conservation" as National Standard 4
requires.  16 U.S.C. § 1851(a)(4).  As NMFS reasons, "[a]n allocation scheme may promote

conservation by encouraging a rational, more easily managed use of the resource."  50 C.F.R.

§ 600.325(c)(ii); *see also C & W Fish Co.*, 931 F.2d at 1564 (noting that "[t]his requirement

poses only a minimal hurdle for" the agency).  NMFS has explained at length how the exclusion

of discarded fish from the ACL is necessary to effectively manage the red snapper stock because

of significant uncertainty in those estimates.  *See* AR 009958; AR 007173.  The agency

additionally explained its understanding at the time it published Amendment 43 that "allowing

the same amount of harvest as harvest that occurred in 2014 is unlikely to result in overfishing or

to change the red snapper rebuilding time period."  AR 010023.  NMFS came to this conclusion

in the context of data showing "significant increase in stock biomass since 2010 to levels not

seen since the 1970's."  AR 010023.  The Court thus concludes that any de facto reallocation

resulting from the exclusion of dead discards from the recreational ACL was reasonably

calculated to promote conservation.

In sum, the Court concludes that Amendment 43, the 2023 Temporary Rule, and the 2024

Interim Rule did not effect an allocation of fishing privileges or harvest restrictions.  Even if

those regulations did create a new allocation, the arrangement is fair and equitable and

reasonably calculated to promote conservation.  NMFS is therefore entitled to summary

judgment on Counts 3 and 6 of the Supplemental Complaint.

## V.  CONCLUSION

For the foregoing reasons, Defendants' Motion for Summary Judgment and Motion for

Partial Summary Judgment are **GRANTED**, and Plaintiffs' Motion for Summary Judgment and

Motion for Partial Summary Judgment are **DENIED**.  An order consistent with this

Memorandum Opinion is separately and contemporaneously issued.

Dated:  January 31, 2025                                  RUDOLPH CONTRERAS
                                                         United States District Judge